# United States Court of Appeals for the Federal Circuit

---

**DOUGLAS KAHN,**
*Petitioner,*

**v.**

**DEPARTMENT OF JUSTICE,**
*Respondent.*

---

2009-3125

---

Petition for review of the Merit Systems Protection Board in AT1221060966-M-1.

---

Decided: September 7, 2010

---

THOMAS G. ROTH, Law Offices of Thomas G. Roth, of West Orange, New Jersey, argued for petitioner.

L. MISHA PREHEIM, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and TODD M. HUGHES, Deputy Director. Of counsel on the brief was LESLIE K. SCHUMACHER, Senior Attorney, Office of Chief Counsel, Drug Enforcement Administration, of Springfield, Virginia.

---

Before GAJARSA, MAYER, and SCHALL, *Circuit Judges*.

GAJARSA, *Circuit Judge*.

This is a matter arising under section 4(a) of the Whistleblower Protection Act of 1989 ("WPA"), 5 U.S.C. § 2302(b)(8) (2006). Douglas Kahn is a Special Agent Criminal Investigator with the U.S. Drug Enforcement Administration ("DEA"). He appeals from the Merit Systems Protection Board's ("Board") final decision that Kahn did not make protected disclosures under the WPA. *See id.* § 2302(b)(8)(A). This is Kahn's second appeal from the Board. In the previous appeal, this court reversed the administrative judge's decision that the Board lacked jurisdiction over his individual right of action ("IRA"). *See Kahn v. Dep't of Justice*, 528 F.3d 1336, 1338 (Fed. Cir. 2008). We affirm and hold that Kahn did not make protected disclosures under the WPA.

## BACKGROUND

The DEA employed Kahn as a Special Agent Criminal Investigator, "to plan and conduct highly complex criminal investigations primarily involving major violators in large-scale drug trafficking networks operating throughout several regions of the United States, nationwide or internationally." J.A. 1178. His performance work plan shows that the DEA tasked Kahn with, e.g., "'initiat[ing], plan[ning], and coordinat[ing] investigations and enforcement operations," "recruit[ing], develop[ing], debrief[ing], document[ing], and/or coordinat[ing] program[s] on confidential sources," and "ensur[ing] investigative and other administrative files are up-to-date and in compliance with DEA policies and procedures." J.A. 7 (alterations in the original) (internal quotation marks omitted); *see also* J.A. 1208–14; J.A. 1232–40.

In 2002, Kahn was part of a "Provisional Task Force" ("Task Force") in the DEA's office in Beaufort, South Carolina. *Kahn*, 528 F.3d at 1338. The Task Force investigated drug crimes and aided the U.S. Attorney's Office in Charleston, South Carolina in developing cases against persons accused of drug crimes. *Id.* In addition to Kahn, the Task Force included DEA Special Agent Henry Meehan, Officer Donald Annis from the Beaufort County Sheriff's Office, and Officer Tony Herald from the Beaufort Police Department. *Id.* at 1338–39. The Beaufort DEA Office designated Annis and Herald as Task Force Agents. *Id.* at 1339 n.3. As members of the Task Force, Annis and Herald were sworn in as "full-time DEA task force officers." J.A. 256. All members of the Beaufort Task Force reported to the Resident Agent in Charge, Steven Mitchell, located in Charleston, South Carolina. *Kahn*, 528 F.3d at 1339. Mitchell, in turn, reported to the Assistant Special Agent in Charge, John Ozaluk, who was stationed in the DEA's Columbia, South Carolina Office. *Id.*

Although Kahn and Meehan shared the same position and government service level, the administrative judge found that Kahn "functioned as the 'lead agent' in the Beaufort office, the single point of contact through which operational details of all ongoing investigations were submitted up the supervisory chain for review and approval." J.A. 8. As Mitchell testified, "[A]ny operational things went through [Kahn]." J.A. 190.

### I. Alleged Protected Disclosures & Transfer to Atlanta Field Office

Sometime in 2002, an individual with an extensive criminal record approached the Task Force about becoming a confidential source for the DEA. *Kahn*, 528 F.3d at 1339. Based on conversations with the informant, Annis

planned on registering the informant with the DEA as a confidential source and using him to obtain crack cocaine from a known DEA target.[1]    To facilitate this plan, Meehan began preparing paperwork to register the informant as a confidential source.  In speaking with Annis, Kahn learned of the informant's criminal history and that he was recently released from prison and on probation. Kahn informed Annis that although the DEA would try to register the informant, his criminal history and probation status might disqualify him as a confidential source under DEA rules and regulations.  Kahn subsequently contacted Mitchell and informed him of Annis's plan to use the informant.  After Kahn discussed the planned ruse with Mitchell, Mitchell instructed Kahn to forbid Annis from using the informant to obtain crack cocaine from the target.    Kahn then communicated that command to Annis.

Annis disobeyed that order.  On approximately May 9, 2002, the informant obtained an ounce of crack cocaine from the DEA target on consignment and transferred the contraband to Annis.  Annis then carried the crack cocaine to the DEA Beaufort Office and demanded that the DEA provide the informant money for the cocaine.  With the hope of registering the informant after the fact, Kahn contacted Mitchell to obtain information on the DEA's policy on using confidential sources "to see what [the

---

[1]    Because the administrative judge did not make findings on the chronology of events and the parties do not dispute chronology, we rely on Kahn's memorandum to Ozaluk for basic dates in our recitation of the facts.  *See* J.A. 565–68.  We note, however, that Kahn stipulated that this memorandum is not part of his alleged protected disclosures and thus consider the memorandum as merely evidence of his communications, not as a basis for a protected disclosure.

DEA] could do to assist this investigation in moving forward." J.A. 446 (alteration added).

On May 10, 2002, Kahn and Mitchell discussed the DEA's new rules and regulations regarding confidential sources, which only Mitchell had access to on a DEA computer. Mitchell testified that under DEA regulations, a DEA agent in Annis's situation would have needed to comply with the following procedures. First, the agent would need to submit an investigative report that included the target of the investigation, the potential source's duties, and the potential source's biographical information, including his criminal history. Second, the agent would need to brief the confidential source on his duties in the investigation. Third, the agent would need to obtain written approval from the state parole office before registering an individual with an extensive criminal history on probation as a confidential source. Fourth, the Resident Agent in Charge and the Assistant Special Agent in Charge would need to approve an operational plan that placed any necessary restrictions on using a confidential source with an extensive criminal history. If the Resident Agent in Charge and the Assistant Special Agent in Charge did not approve of an operational plan and state or local officers carried out a plan under their own authority, the DEA would not reimburse state or local police departments for expenditures.[2]

After reviewing DEA rules for confidential sources, Mitchell and Kahn decided "that there [were] no short cuts that [they] could do to utilize this informant," and that the DEA could not pay for the crack cocaine unless the informant was registered as a confidential source with

---

[2]    Aside from Mitchell's testimony, the parties did not submit evidence of the 2002 DEA rules and regulations for confidential sources in the Beaufort office.

the DEA. J.A. 447 (alterations added). Kahn informed Annis of their decision and suggested that he contact the Beaufort County Sheriff's Office to pay for the cocaine. Kahn reported that Annis was displeased with this decision, stating that "it was an embarrassment for the DEA to have to ask the Beaufort County Sheriff's Office for money." J.A. 566.

On May 13, 2002, Annis informed Kahn and Meehan that DEA Special Agent Steve Migioia and Assistant U.S. Attorney Robert Bickerton in Charleston had authorized the DEA to pay for the cocaine. Surprised by the change of plans, Meehan drove to Charleston to further discuss using the informant with Mitchell, leaving Annis and Kahn alone in the office. Kahn reported that he and Annis then engaged in a heated exchange of words. According to Kahn, Annis claimed that the DEA "was a joke" and warned Kahn that he "did not know who [he] was messing with and that [he] better leave him alone." J.A. 567 (alterations added). At the end of the argument, Annis stated that he wanted to leave the Task Force. Kahn subsequently contacted Mitchell and informed him of his argument with Annis. According to Mitchell, however, Kahn first contacted Ozaluk and informed him of the argument before reporting to Mitchell. Neither Kahn nor Ozaluk make reference to such a conversation in their testimonies.

Later that day, Annis obtained retroactive permission from Beaufort County Sheriff P.J. Tanner to pay for the cocaine as a one-time-only expenditure. However, Tanner declined to use the individual as an informant because of his criminal history.

At the end of May or beginning of June 2002,[3] Kahn and Meehan met with Ozaluk for lunch. At Ozaluk's request, Kahn recounted how Annis used an unregistered informant to obtain crack cocaine from a DEA target and how Annis had changed his attitude towards the DEA. Based on Annis's use of the unregistered informant, Kahn recommended that Ozaluk remove him from the Task Force. Ozaluk agreed and decided to remove Annis because he "tried to circumvent our policies on establishing an individual to become a confidential source of information and had also engaged in actions with this individual that were undocumented and would have led to problems for them had he been allowed to continue." J.A. 65. However, Ozaluk did not report the misconduct to the Office of Professional Responsibility ("OPR") because he felt that Kahn had prevented Annis from violating DEA rules on confidential sources.

On June 14, 2002, Mitchell sent a letter to Tanner requesting that he remove Annis from the Task Force and reassign him to the Beaufort County Sheriff's Office. Tanner granted the request and subsequently removed Annis from the Task Force. *Kahn*, 528 F.3d at 1339.

After the removal, relations between the DEA and the U.S. Attorney's Office in Charleston broke down in a dispute over Kahn. Upset that Annis was removed, Bickerton accused Kahn of being a liar and claimed that Kahn misrepresented facts in his reports. Based on Bickerton's accusations, OPR and the U.S. Attorney's Office conducted independent investigations to determine whether Kahn had previously made false statements or

---

[3]     We note that Mitchell's account of Kahn's meeting with Ozaluk differs from the chronology set out in Kahn and Ozaluk's testimonies. Because Mitchell was not present at the meeting, we rely on Kahn and Ozaluk's testimonies for the chronology.

misrepresentations. The agencies conducted the investigations in part to determine whether prosecutors using Kahn as a witness would need to disclose evidence that affected his credibility at trial under *Giglio v. United States*, 405 U.S. 150 (1972).[4] *See Kahn*, 528 F.3d at 1339–40 & n.4. Both OPR and the U.S. Attorney's Office cleared Kahn of any wrongdoing, concluding that he was not *Giglio*-impaired. Despite these findings, the U.S. Attorney's Office maintained that Kahn had a "character flaw" that required *Giglio* disclosures in all cases in which he would testify and insisted that the DEA transfer Kahn to another office. Although Kahn expressed a desire to fill an opening in North Carolina, the DEA transferred Kahn to its Atlanta Field Office in 2005.

## II. Whistleblower Claim

On August 24, 2005, Kahn filed a whistleblower complaint with the Office of Special Counsel ("OSC"). *Kahn*, 528 F.3d at 1338. In his complaint, Kahn alleged that (1) his reports to Mitchell and Ozaluk constituted protected disclosures under the WPA and (2) "that the DEA had engaged in a prohibited personnel practice in retaliation for those disclosures by transferring him to the Atlanta Field [Office]." *Id.* (alteration added). On July 5, 2006, OSC notified Kahn that "it had terminated its inquiry into his complaint and would not be taking corrective action." *Id.* Kahn then filed his IRA appeal with the Board, which the Board dismissed for lack of jurisdiction. *Id.* at 1340. In his initial decision, the administrative judge found that Kahn failed to make a non-frivolous whistleblower claim because his alleged protected disclosures were part of his normal job duties. This court

---

[4] Under *Giglio*, the agency would be required to disclose the facts of any of Kahn's false statements to the defense during prosecution.

reversed, explaining that "although this is a close case, the combination of . . . Kahn's job description and the competing sworn statements of . . . Kahn and . . . Mitchell places the evidence on the question of . . . Kahn's normal duties in equipoise." *Kahn*, 528 F.3d at 1343. Accordingly, this court held that Kahn had made a non-frivolous allegation of an adverse personnel action based on a protected disclosure and remanded the case to the Board "for a hearing on the merits of the appeal." *Id.* at 1344.

On remand, the administrative judge held that Kahn failed to establish by a preponderance of the evidence that he made a protected disclosure. First, the administrative judge found that when Kahn communicated to Mitchell his concerns over Annis's use of an unregistered informant, he was not sure whether using such an informant constituted a violation of DEA rules. Instead of reporting a violation, the administrative judge found that he was "inquiring as to whether there was a way that . . . Annis'[s] interest in using this problematic [informant] could be accommodated within DEA policy." J.A. 5 (alterations added). In finding against Kahn, the administrative judge emphasized that "[t]he record does not reflect that any violation of DEA policy actually occurred." J.A. 4. In making these findings, the administrative judge implied that Kahn did not reasonably believe that Annis had violated DEA regulations. Second, the administrative judge held that even if Kahn reasonably believed that he reported a violation of DEA regulations to Mitchell, Kahn's disclosures were not protected under the WPA because they were made as part of his normal duties through normal channels. "[I]t is readily apparent from all available evidence, including the appellant's own testimony, that in discussing Mr. Annis'[s] actual or proposed use of the [informant] in question with his superiors, [Kahn] was, in fact, engaged in the core pur-

pose of his position of Criminal Investigator . . . ." J.A. 7 (alterations added). Because Kahn did not request rehearing from the Board, the administrative judge's decision became the Board's final decision.

Kahn timely appealed to this court. This court has jurisdiction over Kahn's appeal pursuant to 28 U.S.C. § 1295(a)(9).

## DISCUSSION

The WPA prohibits agencies from taking an adverse personnel action against an employee in retaliation for "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences . . . a violation of any law, rule, or regulation." 5 U.S.C. § 2302(b)(8)(A). To make a whistleblower claim under the WPA, a petitioner must first exhaust his administrative remedies and make a non-frivolous allegation of an adverse personnel action based on a protected disclosure. *Yunus v. Dep't of Veterans Affairs*, 242 F.3d 1367, 1372 (Fed. Cir. 2001). After satisfying these jurisdictional requirements, the petitioner is entitled to a hearing on the merits, *see* 5 U.S.C. § 7701, in which the petitioner bears the burden of proof to establish "by a preponderance of the evidence" the merits of his claim, 5 C.F.R. § 1201.56(a)(2)(i) (2009); *see also Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1344 (Fed. Cir. 2006) (en banc).

Specifically, the petitioner must establish by a preponderance of the evidence the following four elements: (1) the acting official has the authority to take, recommend, or approve any personnel action; (2) the aggrieved employee made a disclosure protected under 5 U.S.C. § 2302(b)(8)(A); (3) the acting official used his authority to take, or refuse to take, a personnel action against the aggrieved employee; and (4) the protected disclosure was

a contributing factor in the agency's personnel action. *See Chambers v. Dep't of Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010); *Lachance v. White*, 174 F.3d 1378, 1380 (Fed. Cir. 1999). This appeal only concerns the second and fourth elements—whether the aggrieved employee made a protected disclosure and whether that protected disclosure was a contributing factor.

Our review of Board decisions is limited. We may only reverse a Board decision if we find the decision to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law; or unsupported by substantial evidence. 5 U.S.C. § 7703(c).

## I.   Protected Disclosure

A protected disclosure is, in relevant part, "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences . . . a violation of any law, rule, or regulation." 5 U.S.C. § 2302(b)(8)(A). We have interpreted this statutory definition to cover an employee communication (1) that discloses unknown information, (2) that an employee would reasonably believe is unlawful, and (3) that is outside the scope of the employee's normal duties or communicated outside of normal channels.

First, we have interpreted the term "disclosure" broadly to reflect the WPA's legislative history. *See Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1347–48 (Fed. Cir. 2001). In 1989, Congress enacted the WPA in part to broaden the disclosures protected under the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, 1116. Specifically, Congress changed the language of 5 U.S.C. § 2302(b)(8)(A) from "*a* disclosure" to "*any* disclosure." Whistleblower Protection Act of 1989, Pub. L. No. 101-12, § 4(a)(3), 103 Stat. 16, 32 (emphases added).

Even though the WPA covers a broad swath of communications, the communication must still be a "disclosure" to qualify for protection. We have generally defined the term "disclosure" to mean "to reveal something that was hidden and not known." *Huffman*, 263 F.3d at 1350. Moreover, "the disclosure must pertain to the underlying conduct, rather than to the asserted fact of its unlawfulness or impropriety." *Id.* at 1350 n.2. Thus an employee who reports to a wrongdoer that his conduct is unlawful or improper has not made a protected disclosure if the wrongdoer already knew of his conduct. *Id.*

Second, the petitioner must establish that "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [would] reasonably conclude that the actions of the government evidence [a violation of any law, rule, or regulation]." *Lachance*, 174 F.3d at 1381 (alterations added). While analyzing purely subjective beliefs is insufficient, *id.*, a petitioner's motive for making disclosures is relevant to the merits of the whistleblower claim in as much as it is evidence of reasonable belief, *Johnston v. Merit Sys. Prot. Bd.*, 518 F.3d 905, 911 (Fed. Cir. 2008). The petitioner need not prove an actual violation of law, rule, or regulation. "The test is not whether [the petitioner] was able to prove [a violation], but rather could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by [the petitioner] reasonably conclude . . . that a violation did occur." *Drake v. Agency for Int'l Dev.*, 543 F.3d 1377, 1382 (Fed. Cir. 2008) (alterations added).

Third, an employee must communicate the information either outside the scope of his normal duties or outside of normal channels to qualify as a protected disclosure. In *Huffman*, we outlined three categories into which an employee's communications may fall, including

(a) disclosures made as part of normal duties through normal channels, (b) disclosures made as part of normal duties outside of normal channels, and (c) disclosures made outside of normal or assigned duties. *Huffman*, 263 F.3d at 1352–54; *see also Fields v. Dep't of Justice*, 452 F.3d 1297, 1305 (Fed. Cir. 2006). A communication can only qualify as a protected disclosure if it falls within the latter two categories. *Kahn*, 528 F.3d at 1341; *Fields*, 452 F.3d at 1305.

In this case, the administrative judge did not err in finding that Kahn's communications with Mitchell were not protected disclosures because Kahn reported Annis's conduct to Mitchell as part of normal duties through normal channels. *See Huffman*, 263 F.3d at 1352. According to Kahn's official job description, a Special Agent Criminal Investigator "plan[s] and conduct[s] highly complex criminal investigations primarily involving major violators in large-scale drug trafficking networks operating throughout several regions of the United States." J.A. 1178 (alterations added). Kahn's position included "'initiat[ing], plan[ning], and coordinat[ing] investigations and enforcement operations," "recruit[ing], develop[ing], debrief[ing], document[ing], and/or coordinat[ing] program[s] on confidential sources," and "ensur[ing] investigative and other administrative files are up-to-date and in compliance with DEA policies and procedures." J.A. 7 (alterations in the original) (internal quotation marks omitted). In addition to this basic job description, the administrative judge credited Mitchell and Ozaluk's testimony that Kahn was the DEA Beaufort Office's "lead agent" and that he would have been responsible for reviewing the operational plan and the use of any confidential source in Annis's investigation—even if Meehan was working with Annis as Kahn claimed. The administrative judge found that Kahn "functioned as the 'lead agent' in

the Beaufort office, the single point of contact through which operational details of all ongoing investigations were submitted up the supervisory chain for review and approval." J.A. 8.

Even though Kahn argues on appeal that his role as lead agent only required him to review reports for grammar and DEA format, Mitchell and Ozaluk's testimony support the administrative judge's finding that Kahn's informal responsibilities included reporting to Mitchell on ongoing investigations assigned to other agents, including reports on confidential sources. The administrative judge appears to have credited Mitchell and Ozaluk's testimony over Kahn's. We have held that "an evaluation of witness credibility is within the discretion of the Board and that, in general, such evaluations are 'virtually unreviewable' on appeal." *King v. Dep't of Health & Human Servs.*, 133 F.3d 1450, 1453 (Fed. Cir. 1998) (quoting *Clark v. Dep't of Army*, 997 F.2d 1466, 1473 (Fed. Cir. 1993)). Giving deference to the Board's credibility determinations, we conclude that Kahn's communications with Mitchell fall under *Huffman* category one as disclosures made as part of normal duties through normal channels. *See* 263 F.3d at 1352. Accordingly, we affirm the administrative judge's finding that Kahn's communications with Mitchell were not protected disclosures.

In addition to Kahn's communications with Mitchell, we must also consider his communications with Ozaluk. The government asserts that Kahn has not argued on appeal that the administrative judge erred in finding that his communications with Ozaluk were not protected. *See* Oral Argument at 18:40–18:56, *Kahn v. Dep't of Justice*, No. 2009-3125 (Fed. Cir. Mar. 2, 2010) [hereinafter "Oral Argument"], *available at* http://oralarguments.cafc.uscourts.gov/mp3/2009-3125.mp3. Since his initial complaint to OSC, however, Kahn has alleged that both his reports to Mitchell *and*

Ozaluk constituted protected disclosures. On appeal, Kahn maintains that he "verbally told . . . Mitchell and . . . Ozaluk of . . . Annis'[s] violations of DEA's rules and regulations." Appellant's Br. 9; *see also id.* at 10, 27, 33, 41. Because Kahn has consistently maintained that his communications with Ozaluk were protected disclosures, he has not waived an argument as to those communications on appeal.

As for the merits, however, Kahn's communications with Ozaluk do not qualify as disclosures under our precedent. *See Huffman*, 263 F.3d at 1350. Although the administrative judge failed to separately analyze Kahn's communications with Ozaluk, Kahn's own account demonstrates that his communications with Ozaluk were not disclosures. According to Kahn, he communicated all of his interactions with Annis to Mitchell *before* his lunch meeting with Ozaluk. Consequently, the DEA was aware of Annis's conduct before Ozaluk met Kahn for lunch at the end of May or beginning of June 2002. As Ozaluk testified, "[Kahn] was advising . . . Mitchell on everything that was happening in that office, Task Force Officer Annis, and other administrative functions and operational issues." J.A. 79. Although Ozaluk testified that he was unsure as to which information on Annis's conduct came from Kahn and which information came from Mitchell, *see* J.A. 81, Ozaluk undisputedly knew that Kahn and Annis had a disagreement over the informant before he met with Kahn for lunch and requested that Kahn "explain what was going on with . . . Annis," J.A. 397; *see also* J.A. 79–81. Therefore, Kahn's report to Ozaluk was not a disclosure because Kahn did not "reveal something that was hidden and not known" to the DEA. *Huffman*, 263 F.3d at 1350; *see also* Oral Argument at 19:22–20:33, 20:29–20:48.

To be sure, we have interpreted the term "disclosure" broadly to include any disclosure. *Id.* at 147–48. Congress inserted the word "any" into § 2302(b)(8)(A) to protect at least some employees who report information that agency members already knew when the employees' disclosures satisfy the other statutory requirements. *See* S. Rep. No. 100-413, at 13 (1988) ("[I]t is inappropriate for disclosures to be protected only if they are made for certain purposes or to certain employees or only if the employee is the first to raise the issue."). We accounted for this legislative history when we defined disclosure and outlined the three disclosure categories in *Huffman*. *See* 263 F.3d at 1347–54. We noted that *Huffman* category two includes "a law enforcement officer who is responsible for investigating crime by government employees who, feeling that the normal chain of command is unresponsive, reports wrongdoing outside of normal channels." *Id.* at 1354. The WPA thus recognizes an employee's report of wrongdoing as a disclosure when his first-line supervisor ignores the report and the employee is forced to communicate the wrongdoing outside the chain of command. But there is no evidence that Mitchell, Kahn's first-line supervisor, disregarded Kahn's reports on Annis's conduct. Instead, Mitchell worked closely with Kahn in an attempt to register the informant as a confidential source and relayed at least some of Kahn's reports on Annis to Ozaluk.

Although we affirm the Board's judgment, we note that the administrative judge erroneously stressed that Annis did not violate DEA rules. The administrative judge credited Mitchell's testimony that Annis was "'trying to take of [sic] his hat, I believe, as a task force officer and put it on as a Beaufort County deputy.'" J.A. 4 (quoting J.A. 186). According to the administrative judge, Tanner's after-the-fact, one-time authorization to pur-

chase the cocaine for Annis's informant technically avoided violating DEA rules. Even if Annis avoided violating DEA rules, the administrative judge failed to analyze Annis's conduct from a disinterested observer's perspective. Instead, the administrative judge appears to have "erroneously required [Kahn] to prove that an actual violation occurred," which is directly contrary to our precedent. *Drake*, 543 F.3d at 1382 (alteration added). Moreover, the administrative judge failed to analyze whether a disinterested observer at the time Kahn spoke with Ozaluk would have reasonably believed he was reporting misconduct. According to the administrative judge, "prior to his conversations with . . . Mitchell, [Kahn] did not himself know whether, in fact, . . . Annis'[s] activities were in violation of agency guidelines." J.A. 5 (alterations added). But that says nothing about the knowledge a reasonable observer in Kahn's position would have had *after* speaking with Mitchell about the guidelines. Despite these legal errors, we affirm the Board's decision on other grounds as explained above.[5] We reiterate, however, that "[t]he test is not whether [the petitioner] was able to prove [a violation], but rather

---

[5]   Kahn argues that the government conceded in the first appeal that Kahn reasonably believed that he was reporting a violation of DEA rules or regulations. In support, Kahn cites footnote five of our previous opinion, which states, "On appeal, the government does not dispute the [administrative judge]'s assumption that . . . Kahn's reports constituted disclosures of violations of DEA rules and regulations." *Kahn*, 528 F.3d at 1344 n.5 (alteration added). Because we hold that Kahn's communications with Mitchell were part of his normal duties through normal channels and that his communications with Ozaluk were not disclosures, we need not address whether a disinterested observer in Kahn's position could reasonably believe that Annis violated DEA rules and regulations or whether the government conceded as much.

could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by [the petitioner] reasonably conclude . . . that a violation did occur." *Drake*, 543 F.3d at 1382 (alterations added).

## II. Contributing Factor

Even though the administrative judge declined to address the issue, Kahn requests that this court find that the government has not shown by clear and convincing evidence that the DEA would have transferred him to the Atlanta Field Office independent of his communications with Mitchell and Ozaluk. On remand from the previous appeal, the DEA stipulated that Kahn's communications with his supervisors were a contributing factor to its decision to transfer Kahn. *See* Appellee's Br. 33 n.6; J.A. 27. Pursuant to 5 U.S.C. § 1221(e)(2), "[i]f the employee or applicant makes out a prima facie whistleblower claim, the agency is given an opportunity to prove, by clear and convincing evidence, that it would have taken the same personnel action in the absence of the protected disclosure." *Fellhoelter v. Dep't of Agriculture*, 568 F.3d 965, 970–71 (Fed. Cir. 2009). Because we hold that Kahn's communications were not protected under the WPA, we need not address whether the government could have shown by clear and convincing evidence that it would have transferred Kahn to the Atlanta Field Office in the absence of his communications.

However, had we agreed with Kahn in this appeal, we would have again remanded the case to the Board to determine whether the DEA had shown by clear and convincing evidence that it would have transferred Kahn to the Atlanta Field Office independent of his protected disclosure. To avoid such inefficiency in the future, the Board should resolve all contested issues on the merits after a petitioner in a whistleblowing case has established

jurisdiction and is entitled to a hearing on the merits. *Cf. Simmons Fastener Corp. v. Ill. Tool Works, Inc.*, 739 F.2d 1573, 1576 (Fed. Cir. 1984) (directing district courts to decide both infringement and validity before final judgment). Accordingly, in a hearing on the merits, the Board should make findings on whether (1) the acting official had the authority to take, recommend, or approve any personnel action; (2) the aggrieved employee made a disclosure protected under § 2302(b)(8)(A); (3) the acting official used his authority to take, or refuse to take, a personnel action against the aggrieved employee; (4) the protected disclosure was a contributing factor in the agency's personnel action; and (5) the agency would have taken the same personnel action in the absence of the protected disclosure. *See Chambers*, 602 F.3d at 1376; *Fellhoelter*, 568 F.3d at 970–71. If the Board finds one of those contested issues dispositive, it should nevertheless resolve the remaining issues to expedite resolution of a case on appeal.

## CONCLUSION

For the foregoing reasons, we hold that Kahn's communications with Mitchell and Ozaluk were not protected disclosures under the WPA.

## **AFFIRMED**

### COSTS

No Costs.