NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**DONALD EDLER,**

*Petitioner*

**v.**

**DEPARTMENT OF VETERANS AFFAIRS,**

*Respondent*

---

2021-1694

---

Petition for review of the Merit Systems Protection Board in No. CH-0714-20-0448-I-1.

---

Decided: February 1, 2022

---

DAVID DUWEL, Duwel Law, Dayton, OH, for petitioner. Also represented by JEFFREY M. SILVERSTEIN, Freking Myers & Reul LLC, Dayton, OH.

DAVID MICHAEL KERR, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., TARA K. HOGAN.

---

Before MOORE, *Chief Judge*, PLAGER and O'MALLEY,
*Circuit Judges*.

PER CURIAM.

Donald Edler ("Edler") seeks review of the Merit Systems Protection Board ("the Board") decision affirming the Department of Veterans Affairs ("VA") decision to remove him from the position of housekeeping supervisor for two charges: (1) privacy violation; and (2) conduct unbecoming a federal employee. *Edler v. Dep't of Veterans Affairs*, No. CH-0714-20-0448-I-1, 2020 MSPB LEXIS 4618 (M.S.P.B. Nov. 17, 2020) ("*Decision on Appeal*"). For the reasons explained below, we *affirm*.

## I. BACKGROUND

In November 2009, Edler began working for the VA as a housekeeper at the Veterans Health Administration Facility in Chillicothe, Ohio. In October 2010, the VA promoted Edler to the position of housekeeping supervisor. In that capacity, Edler supervised approximately 13 employees on third shift.

On March 29, 2020, Edler conducted a team meeting, referred to as a "team huddle." *Decision on Appeal*, 2020 MSPB LEXIS 4618, at *1–2. During this team huddle, Edler made three comments that are relevant to this appeal. First, Edler informed the team that several employees were unable "to work in rooms used to treat COVID-19 patients." *Id.* at *2. In doing so, Edler "identified each affected employee and announced the specific medical condition that precluded him or her from doing the work." *Id.* Second, Edler made several comments about an employee, B.L., "who needed to be fit-tested for a mask but had not yet shaved his beard, which was necessary for the proper fit." *Id.* Edler told B.L. that if he failed to shave his beard to be fitted for an N95 mask he risked bringing COVID-19 home to his family. *Id.* at *10. Edler also told B.L. that if he failed to comply, he would likely be terminated and

walked out to Route 104, which is the highway that runs outside the Chillicothe, VA facility. *Id.* at *11. Third, while explaining the COVID-19 situation that his team faced, Edler made comments about Somali refugees in Michigan. Specifically, Edler stated that "these refugees had mingled with Chinese nationals who had COVID-19 and were spreading the disease in Dearborn and Detroit, Michigan." *Id.* at *2. Edler explained that "ventilators were diverted from the Chillicothe facility to Michigan as a result of the refugees spreading the virus." *Id.* at *14.

After the VA received notice of Edler's comments during the team huddle, Government Information Specialist Barbara Burkhart investigated and obtained statements from several employees. Twelve third-shift employees provided signed witness statements regarding what occurred during the team huddle.

On May 28, 2020, Chief of Environmental Management Service Rachel Boggess proposed to remove Edler, pursuant to 38 U.S.C. § 714, based on two charges: privacy violation and conduct unbecoming of a federal employee. Edler orally responded to the charges in June 2020, but did not provide a written response. As to the privacy violation, Edler admitted that he "disclosed personal, medical information about individual employees . . . [b]ut he said that . . . employees talk amongst themselves and they probably knew most of this information anyway." J.A. 139. As to conduct unbecoming of a federal employee, Edler admitted to telling an employee that, "if they didn't do what he said with shaving and wearing the mask and being compliant then he would walk them out to Route 104." J.A. 142. Edler also admitted to "talking about how the COVID was spread and Michigan was a hot spot and that there was something about a plane that left China during the COVID pandemic that got diverted and landed in Michigan, Detroit." J.A. 139. Edler explained that "the discussion in his staff meeting where this came up was about the high

numbers in Michigan and the fact that we had to send our ventilators to Michigan." J.A. 140.

On June 11, 2020, Medical Center Director Kathy W. Berger issued a decision sustaining both charges and removing Edler from his position, effective June 17, 2020. Berger emphasized to Edler that, "[a]s a supervisor in the housekeeping service at the Chillicothe VA Medical Center, it is expected that you maintain a high level of professionalism, set positive examples for your subordinates, and lead by example." J.A. 4. As to the privacy violation, Berger explained that, "[r]egardless of whether you believe that the employees already informed others of their medical condition, employees are not authorized to reveal the medical conditions of other employees." *Id.* Berger also explained that Edler's "offhand personal comments relating to [his] belief of how the COVID-19 virus has spread and who has spread it" were "unprofessional and not becoming of a federal employee that is a supervisor." *Id.*

Edler appealed his removal to the Board. The administrative judge ("AJ") held a hearing in September 2020, at which several witnesses testified, including Edler and many of the employees who attended the team huddle.

On November 17, 2020, the AJ issued an initial decision sustaining the VA's decision to remove Edler. At the outset, the AJ noted that "there is little factual dispute as to the underlying events that led to the charges" and that Edler "disagrees with the characterization of the incident as worthy of disciplinary action and asserts that the penalty of removal was not supported by the evidence." *Decision on Appeal*, 2020 MSPB LEXIS 4618, at *5–6. The AJ found, however, that the VA met its burden of establishing each of the charges by substantial evidence and that substantial evidence supported the penalty of removal.

As to the privacy violation charge, Edler admitted that, during the March 29, 2020 team huddle, he identified employees by their specific medical conditions, but argued

that he did not actually disclose any medical information "because he believed the employees freely shared their medical concerns with each other." *Id*. at *7. The AJ found this argument unpersuasive. Several employees testified at the hearing that they were required to disclose their medical information to Edler to demonstrate their risk category for COVID-19. *Id*. While some employees shared information about their health conditions with certain members of the team, they did not share that information with everyone. Several witnesses testified that they first became aware of their teammates' medical conditions when Edler disclosed them during the huddle. Other employees who did not testify at the hearing also provided statements that they too were unaware of their co-workers' medical conditions prior to the team huddle. The AJ found the witness testimony credible and that the VA met its burden with respect to the privacy violation charge.

As to the charge of conduct unbecoming of a federal employee, the AJ found substantial evidence supporting both specifications. For the first specification, Edler admitted that, during the team huddle, he told B.L. that he needed to shave his beard in order to be fit-tested and that failure to do so would put his family at risk. Edler further admitted that he did not advise B.L. "of the proper disciplinary procedures for failing to follow a direct order." *Id*. at *11. Edler testified that he was "stern," but was simply advising B.L. of the facts. B.L., on the other hand, stated that he felt "'belittled,' 'attacked,' 'disrespected,' and 'humiliated' at the way he was singled out in front of the entire unit." *Id*. Other witnesses supported B.L.'s version of the interaction and testified that Edler's comments were "abusive in tone." *Id*. at *12. Given the witness testimony, the AJ found that Edler's conduct toward B.L. during the team huddle supported the charge of conduct unbecoming.

For the second specification of this charge, Edler admitted that he made comments associating the COVID-19 outbreak in Michigan with Somali refugees. *Id*. at *13.

Although Edler testified that he was merely repeating a news report he saw on television, the employees who heard his comments testified that Edler's tone of voice was "negative and disrespectful." *Id.* at \*14. The AJ found Edler's characterization of his remarks not credible, given the "witnesses' overwhelming characterization of [Edler's] comportment up to this point in the huddle as screaming, yelling, ranting, and belittling." *Id.* Based on the evidence, the AJ found that a reasonable person could conclude that Edler's comments "were an extension of an inappropriate rant, and were disrespectful and derogatory in tone." *Id.* at \*14–15. The AJ noted, moreover, that Edler's comments did not relate to the team's duties. On this record, the AJ found substantial evidence supporting the second specification of the charge of conduct unbecoming.

Finally, the AJ found that "the agency met its burden of proving that removal was a reasonable penalty in this case." *Id.* at \*16. In reaching this conclusion, the AJ explained that Berger considered the record evidence, including Edler's oral response to the proposed removal, and observed that his "conduct during the huddle was bullying and put the employees in fear of retribution or retaliation." *Id.* at \*16–17. Berger found that, although Edler had no prior record of discipline, "this fact did not outweigh the severity of the charges against him." *Id.* at \*18. The AJ found that Berger "reasonably considered the relevant mitigating and aggravating factors before settling on removal as the penalty for [Edler's] misconduct." *Id.* Accordingly, the AJ affirmed the VA's decision to remove Edler.

The AJ's initial decision became the final decision of the Board, and Edler timely petitioned this court for review. We have jurisdiction to review final Board decisions under 28 U.S.C. § 1295(a)(9).

## II. DISCUSSION

The scope of our review in an appeal from the Board is limited by statute. We must affirm the Board's decision

unless it was: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence."  5 U.S.C. § 7703(c).

On appeal, Edler argues that there is insufficient evidence in the record to support the VA's removal decision. As to the privacy violation charge, Edler maintains that the AJ failed to understand his reason for sharing employee health information; namely, to convince healthy employees to be fit tested for N95 masks, since their coworkers with severe medical conditions were unavailable to clean COVID-19 medical rooms.  Pet'r Br. 5.  As to the charge of conduct unbecoming of a federal employee, Edler submits that the AJ "failed to confine her analysis to the actual conduct set forth in the specifications and instead credited witness testimony about other non-charged" conduct.  *Id.* Finally, Edler alleges that there is insufficient evidence in the record to support the penalty of removal. We address each argument in turn.

## A.  Privacy Violation

There is no dispute that Edler disclosed the medical conditions of several employees during the March 29, 2020 team huddle.  Although Edler asserts that the AJ failed to consider his motivation for disclosing that information, there is no indication that the AJ did not understand or consider the context in which Edler disclosed the employees' medical information.  To the extent Edler is suggesting that his intent is somehow relevant to the privacy violation charge, he provides no support for that position, and we have found none.  Neither the charge label nor the narrative description required the VA to prove that Edler's disclosure was without reason. *See Decision on Appeal*, 2020 MSPB LEXIS 4618, at *6 ("The Board has not defined specific elements of proof for the charge of privacy violation. Accordingly, I must look to the specifications brought by

the agency to determine if the agency has established the particular facts alleged therein.").

Next, Edler asserts that, "if employees disclosed their medical conditions to him and other employees[,] he was free to discuss same at the team huddle." Pet'r Br. 13. The AJ considered this argument and found it unpersuasive. Specifically, the AJ found that "[e]mployees who are required to disclose their medical conditions in order for the agency to protect their safety while carrying out its mission should not then have their personal health information broadcast to an entire crew who does not have a need to know the information." *Decision on Appeal*, 2020 MSPB LEXIS 4618, at *7–8. And, as the AJ explained, Edler's failure to maintain the confidentiality of this information contravenes the agency's obligations under the Rehabilitation Act of 1973. *Id.* at *8 (citing 42 U.S.C. § 12112(d)(4); 29 U.S.C. § 791(f); *Felton A. v. U.S. Postal Servs.*, E.E.O.C. Appeal No. 0120182134, 2019 WL 7603048 (Dec. 17, 2019)).

Finally, Edler takes issue with the AJ's reference to statements given by "several other witnesses" who did not testify at the hearing. Pet'r Br. 17. At the hearing, several employees testified that, "while they shared information about their health conditions with some members of the team, they did not share the information with the entire team," and no one gave Edler "permission to share or discuss their medical diagnoses with others." *Decision on Appeal*, 2020 MSPB LEXIS 4618, at *8. The AJ found this testimony credible—a determination that is "virtually unreviewable" on appeal. *See Kahn v. Dep't of Justice*, 618 F.3d 1306, 1313 (Fed. Cir. 2010) ("We have held that 'an evaluation of witness credibility is within the discretion of the Board and that, in general, such evaluations are virtually unreviewable on appeal.'" (citation omitted)).

The AJ also noted that several employees who did not testify at the hearing "provided statements that they first became aware of their co-workers' medical conditions"

during the team huddle.  *Decision on Appeal*, 2020 MSPB LEXIS 4618, at \*9.  According to Edler, because these individuals were not actually "witnesses" at the hearing who were subject to cross-examination "any determination as to their credibility is clearly erroneous" and renders the AJ's analysis "faulty."  Pet'r Br. 17.  We disagree.  The AJ merely noted that the statements of non-testifying employees corroborated the testimony of those individuals who did testify.  *Decision on Appeal*, 2020 MSPB LEXIS 4618, at \*9.  The AJ did not actually make credibility determinations with regard to the non-testifying employees.  The mere reference to the written statements does not undercut the otherwise substantial evidence that supports the AJ's conclusions on the privacy violation charge.

### B.  Conduct Unbecoming of a Federal Employee

For the charge of conduct unbecoming of a federal employee, the narrative description consists of two specifications: (1) Edler's interaction with B.L. regarding his failure to shave his beard; and (2) Edler's comments associating COVID-19 outbreaks in Michigan with Somali refugees.  Edler challenges both specifications on appeal.

As to the first specification, Edler admitted that he told B.L. that he would likely be terminated if he did not shave his beard to be fit-tested and that he risked taking COVID-19 home to his family.  Edler also conceded that he did not advise B.L. of the proper disciplinary process.  Although Edler admitted to the conduct alleged in the first specification, he "disagree[d] with the witnesses' characterization of his tone and demeanor" and maintained that he was appropriately "stern."  *Decision on Appeal*, 2020 MSPB LEXIS 4618, at \*11.  The AJ rejected Edler's characterization of the interaction as not credible in light of witness testimony and written statements describing Edler's behavior as "yelling," "screaming," or "ranting" about B.L. in an abusive and aggressive tone.  *Id.* at \*12.  The AJ found "the descriptions of the events offered by these employees and

[B.L.] to be consistent with each other and more credible than that offered by [Edler]." *Id.* As noted, these credibility determinations are "virtually unreviewable" on appeal. *King v. Dep't of Health & Human Servs.*, 133 F.3d 1450, 1453 (Fed. Cir. 1998) (citation omitted).

Next, Edler asserts that he "was not charged with using an improper tone, yelling, screaming or making an employee feel uncomfortable or causing other employees to be upset with his 'rant.'" Pet'r Br. 18. According to Edler, "[t]he only thing that he was charged with was not informing the employee of the proper disciplinary process, if in fact discipline was eventually proposed." *Id.* Edler maintains that his failure to provide B.L. with a detailed explanation of the disciplinary process did not rise to the level of conduct unbecoming of a federal employee. The government submits that Edler's argument "confuses the charge with the specification." Resp't Br. 17. We agree.

"When an agency proposes to discipline an employee, it must notify the employee of the conduct with which he is charged 'in sufficient detail to permit the employee to make an informed reply.'" *Lachance v. Merit Sys. Protection Bd.*, 147 F.3d 1367, 1371 (Fed. Cir. 1998) (quoting *Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1148 (Fed. Cir. 1997)). "Agencies typically fulfill their responsibility to give notice by designating a particular charge and accompanying the charge with a narrative description setting forth the details of the charged misconduct." *Id.*

Here, the VA provided sufficient notice to Edler of the charged conduct. In the notice of proposed removal, the VA charged Edler with conduct unbecoming of a federal employee and described how Edler singled out an employee in the team huddle, instructed him to shave his beard, notified him that he would be "walked to 104," and told him he was risking the health of his family. J.A. 1. It also referenced that Edler failed to inform the employee of the proper disciplinary process. To the extent Edler is alleging that

the VA's narrative description had to include details regarding his tone and demeanor, we disagree. The description provided sufficient detail as to Edler's conduct toward B.L. during the team huddle. And, it was reasonable to assume that the circumstances in which the alleged violations occurred would be both considered and relevant.

Although Edler testified that he was not screaming during his interactions with B.L., he admitted to being "hard on" B.L. and "very direct, to the point[,] and stern." *Id.* As the AJ noted, the deciding official described Edler's behavior as "bullying" and stated that it "harmed the overall morale of the unit." *Decision on Appeal*, 2020 MSPB LEXIS 4618, at *13. Multiple employees indicated that they feared retaliation if they provided a written statement regarding the incident. *Id.* This evidence, coupled with witness testimony, supports the AJ's determination that the VA proved the first specification of the conduct unbecoming charge.

The second specification of the conduct unbecoming charge alleged that, during the team huddle, Edler "made derogatory and disrespectful statements regarding Somalian immigrants in Michigan." J.A. 1. Edler admitted that he made comments associating COVID-19 outbreaks in Michigan with Somali refugees. He also admitted stating that "ventilators were diverted from the Chillicothe facility to Michigan as a result of the refugees spreading the virus." *Decision on Appeal*, 2020 MSPB LEXIS 4618, at *14. As he did before the AJ, Edler "disagrees with the characterization of the comments as being derogatory and disrespectful." *Id.* Specifically, Edler submits that the VA failed to meet its burden with respect to this specification because: (1) he was merely repeating a story he heard on a local newscast; (2) the AJ improperly focused on his tone and demeanor; and (3) there was no evidence that he intended to make derogatory or disrespectful statements. None of these arguments are persuasive.

First, Edler maintains that he was simply repeating a news broadcast and did not make any false statements. To the extent Edler is suggesting that the VA had to show that his statements were false, we disagree. The specification alleges that Edler's statements were derogatory and disrespectful—not that they were false. In any event, the AJ considered and rejected Edler's "testimony that he was merely repeating factual information," finding it not credible. *Id*. at \*14. Witnesses testified that Edler's comments were "mean, nasty" and "aggressive, almost like a verbal attack like on the Somalis." J.A. 44, 114. Given the evidence of record, the AJ found that Edler's "comments regarding the Somalian refugees were an extension of an inappropriate rant, and were disrespectful and derogatory in tone." *Id*. at \*14–15.

Next, Edler argues that the AJ erred by considering his tone and demeanor and should have focused instead on "the words he used." Pet'r Br. 21. But Edler's tone and demeanor are within the scope of the narrative description for this specification, which alleged that Edler's statements about Somali immigrants were "derogatory and disrespectful." J.A. 1. In any event, despite Edler's suggestion to the contrary, the AJ did not ignore the content of his statements. The AJ expressly considered the deciding official's testimony that Edler's comments regarding Somali immigrants were inappropriate and irrelevant "to how the team members were to handle the COVID rooms or perform any other parts of their duties." *Id*. at \*15. Indeed, Edler concedes that his comments were "probably not" needed for the team to perform their job functions. Pet'r Reply 7. By showing that Edler made derogatory and disrespectful comments as charged, the VA satisfied its obligation as to the second specification.

Finally, although Edler argues that he had no intention of disparaging or disrespecting the Somalis, there is no indication that the VA had to prove Edler's intent in order to show that the charged conduct occurred. Neither the

charge label—Conduct Unbecoming of a Federal Employee—nor the specification's narrative description requires the VA to prove an intent to disparage or be disrespectful. Given the witness testimony and characterization of Edler's comments and conduct, the AJ found that Edler made the statements regarding Somali immigrants and that they were, as the VA asserted, derogatory and disrespectful. Substantial evidence therefore supports the AJ's decision on the second specification of the conduct unbecoming charge.

## C. Removal

Edler makes a cursory allegation that "there is insufficient evidence in the record to support the conclusion that [his] removal was consistent with law." Pet'r Br. 22. According to Edler, "[t]he Administrative Judge's decision lacked substantial evidence, and all three specifications necessary to support a removal were not sustained." *Id.* To the contrary, however, the AJ sustained all three specifications. And, as previously explained, substantial evidence supports the AJ's decisions.

As to the VA's choice of penalty, the AJ found that the deciding official, "Ms. Berger[,] considered the proposal, the supporting evidence, and [Edler's] oral response to the proposal in assessing whether removal was necessary." *Decision on Appeal*, 2020 MSPB LEXIS 4618, at *16. The AJ credited Berger's testimony that Edler's "conduct during the huddle was bullying and put the employees in fear of retribution or retaliation" and that his actions "had destroyed unit morale." *Id.* at *17 (citing *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 305 (1981)). Although Berger was aware that Edler "had no prior record of discipline, she stated that this fact did not outweigh the severity of the charges against him." *Id.* at *18 (citing *Douglas*, 5 M.S.P.R. at 305). In these circumstances, Berger determined that Edler "had done so much damage that she felt it was necessary to remove him." *Id.* The AJ considered

the relevant factors and concluded that the penalty of removal was reasonable. Substantial evidence supports that determination and we decline to disturb it.

### III. CONCLUSION

For the foregoing reasons, we *affirm* the Board's decision.

### AFFIRMED

### COSTS

No costs.