Janet M. CLARK, Petitioner,

. v.

DEPARTMENT OF the ARMY,
Respondent.

No. 92–3296.

United States Court of Appeals,
Federal Circuit.

July 1, 1993.

Ernest C. Hadley, of Wareham, MA, argued for petitioner.

Jeri Kaylene Somers, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for respondent. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief was Michael J. Davidson, Captain, Office of the Judge Advocate General, Dept. of the Army, of counsel.

Before NEWMAN, PLAGER, and LOURIE, Circuit Judges.

PLAGER, Circuit Judge.

This case raises several previously unsettled issues regarding the claim of retaliation for whistleblowing. Janet Clark, the petitioner, appeals a decision of the Merit Systems Protection Board (MSPB or Board) that upheld two Department of the Army (Army) actions: demoting her through reduction-in-force procedures, and removing her for failure to follow instructions and delay in carrying out instructions. *Clark v. Department of Army*, Nos. CH–0752–91–0717–I–1 and CH–0351–91–0797–I–1 (MSPB Jan. 17, 1992). Although Clark alleged that these actions were taken in reprisal for whistleblowing disclosures, the Board determined otherwise, on the basis that Clark's disclosures were not a contributing factor in the personnel actions. We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

At the time of her removal, Clark had been employed by the Department of the Army (Army) for approximately twenty-six years. In 1986, while she was a Production Controller, GS–8, at Savanna Army Depot Activity (SADA), she complained to the Army's Office of Inspector General (OIG) about misuse of government telephones, drinking on the job, and mismanagement of time and materials.

Shortly after Clark's reassignment to the position of Computer Assistant, GS–8, there was a change in command at SADA. In July 1989 Lt. Col. John Phillis, Jr. became Commander at SADA, and in August 1989 Captain Michael Demcko became Chief of

SADA's Mission Division and Clark's immediate supervisor. They were not affected by or involved in her previous complaints to OIG, but they may have been informed of them. In the fall of 1989, Clark reported the use of 'bootleg' computer software in government computers to Capt. Demcko and Lt. Col. Phillis.

In May 1990 SADA was directed to reduce its staffing level because of insufficient funding. In response, Capt. Demcko identified nine positions, including Clark's, that would be subject to a reduction-in-force (RIF). Clark was informed on August 6, 1990 that her position was being abolished. She was offered and she accepted the position of Supply Clerk (Typing), GS–5, in the Installation Supply Branch of SADA's Mission Division.

Clark's new duties included processing requisition forms for supplies. In September 1990 she reported to her supervisor, Marcia Hansen, and Capt. Demcko that special order safety shoes were being improperly ordered. In October 1990, Clark contacted OIG to complain that items such as safety shoes and prescription safety glasses were improperly ordered through a local source rather than the central federal supply system, that requisition forms were incorrectly coded and improperly authorized, that vendor payments were not processed promptly, that Imprest Fund vouchers were completed improperly, that supply personnel had inadequate training, and that an employee was selling Avon products during work. Hansen and Capt. Demcko knew of Clark's reports to OIG.

On December 6, 1990 the Chief of Installation Support Division appointed Clark as an Alternate Imprest Fund Cashier. This position required Clark to maintain $3,000 in an account to provide Imprest Fund services when the primary cashier, Donna Stotler, was absent, and to maintain adequate additional funds to cover disbursements. In February 1991 Clark reported to her acting supervisor that a co-worker had violated computer security by failing to 'log off' her computer.

Meanwhile, Clark had filed a complaint with the Office of Special Counsel (OSC),

alleging that the RIF abolishing her position was a reprisal for her whistleblowing. OSC informed Clark on February 6, 1991 that it had found no evidence to support her allegation, and that the timing of events made it unlikely that the RIF was a reprisal. (Clark's complaints to OIG in October 1990 did not occur until after the RIF decision was made in August 1990.)

On Friday, March 1, 1991, Stotler told Clark to sign an interim cash receipt for money from the Imprest Fund. Clark refused. Hansen then instructed Clark to sign for the funds. A heated discussion ensued, and Clark again refused to sign. On Monday, March 4, 1991, Hansen presented Clark with a memorandum that stated, in part:

2. This memorandum constitutes a direct order which orders you to sign for the cash allotment which is necessary for you to properly function and assume your responsibilities as the Alternate Imprest Fund Cashier. On 1 March 1991, you refused to perform this function.

3. Failure to follow this order will be considered insubordination and may be grounds for disciplinary action up to and including removal.

At Clark's request, Hansen called higher level officials to confirm that Clark was required to sign for receipt of the funds. Clark continued to refuse to sign for the money. On March 6, 1991 Hansen finally asked Capt. Demcko to order Clark to sign the receipt for the funds. When he ordered her to do so within fifteen minutes, Clark obeyed.

On April 5, 1991 she filed a complaint with OSC alleging that she had been threatened with disciplinary action, including possible removal, in reprisal for her whistleblowing disclosures to OIG. OSC declined to pursue the matter because the information she supplied indicated no connection between the threat and her disclosures; instead, it appeared that her supervisors had threatened her with disciplinary action in March because of her refusal to perform her duties.

Clark had been notified, through verbal instructions and by a January 16, 1991 memorandum, of the importance of expediting high priority 'Desert Storm' requisitions. Despite this, she continued to process high priority requisitions through the slower federal supply system. On April 8 and 10, 1991 and May 8, 1991 Clark altered the supply source on four high priority 'Desert Storm' requisition forms without authorization; she ordered the repair parts through the federal supply system rather than through the local vendors which were requested.

On June 17, 1991 Capt. Demcko proposed Clark's removal from federal service on the basis that her failure to sign for the Imprest Funds and her improper processing of specific purchase requisitions constituted a defiance of authority, failure to follow instructions, and delay in following instructions. Clark complained to OSC that her proposed removal was a reprisal for whistleblowing, and asked OSC to seek a stay of the action, but OSC declined to pursue the matter. After an oral and written reply, Lt. Col. Phillis removed Clark on July 30, 1991.

Prior to her July removal for cause, Clark had filed with the MSPB an appeal of the RIF removal, pursuant to the Individual Right of Action (IRA) provisions of the Whistleblower Protection Act. 5 U.S.C. § 1221 (Supp. I 1989). On June 27, 1991 that appeal was dismissed by the MSPB without prejudice, pending resolution of the proposed removal for cause. After her removal in July 1991, Clark refiled her previous appeal of the RIF and appealed her removal for cause. The two appeals were consolidated.

On January 17, 1992 the MSPB Administrative Judge's (AJ) initial decision upheld the Army's actions. The AJ found that Clark had disobeyed orders to sign for imprest funds, and had disobeyed instructions to honor high priority requests to purchase supplies from local sources. The AJ found Clark's explanations for her behavior to be inconsistent and incredible, and concluded that the Army had sustained its removal charges against Clark.

The AJ then addressed Clark's allegations that the RIF and removal for cause were taken in reprisal for her whistleblowing disclosures. He expressed doubt that Clark's disclosures rose to the level of protected 'whistleblowing' under 5 U.S.C. § 2302(b)(8) (Supp. I 1989). However, he found it unnec-

essary to address that issue because he concluded that Clark had not proven that her disclosures were a contributing factor in the personnel actions. The AJ's initial decision became final on February 21, 1992 when neither party filed a petition for review with the Board. Clark then appealed here.

## THE WHISTLEBLOWER PROTECTION ACT

Section 2302(b)(8) of Title 5 of the United States Code (Supp. I 1989) prohibits adverse personnel actions against federal government employees in reprisal for certain 'whistleblowing' activities.[1] Section 2302(b)(8) was originally enacted as part of the Civil Service Reform Act of 1978 (CSRA), Pub.L. No. 95–454, § 101, 92 Stat. 1111, 1116 (1978) (codified at 5 U.S.C. § 2302(b)(8) (1988), prior to the 1989 amendment), which established "an extensive framework of merit principles and personnel procedures.... [and] detailed a host of 'prohibited personnel practices,'" among them reprisal for whistleblowing. *Spruill v. Merit Sys. Protection Bd.*, 978 F.2d 679, 682 (Fed.Cir.1992).

In response to reports that the system was ineffective, Congress strengthened the protection afforded to whistleblowers by enacting the Whistleblower Protection Act of 1989 (WPA), Pub.L. No. 101–12, 103 Stat. 16 (1989) (codified in scattered sections of 5 U.S.C.). "The WPA substantially changed the role of the [Office of Special Counsel], revised the substantive provisions of the whistleblower defense, and created a new route in whistleblowing cases for employees to take in appealing agency discipline—the Individual Right of Action (IRA)." *Spruill*, 978 F.2d at 682.

Previously, the whistleblower defense had required an employee to show by a preponderance of the evidence that "(1) a protected disclosure was made, (2) the accused official knew of the disclosure, (3) retaliation resulted, and (4) there was a genuine nexus between the retaliation and petitioner's removal." *Hagmeyer v. Department of Treasury,* 757 F.2d 1281, 1284 (Fed.Cir.1985). The fourth test, nexus, was a particularly difficult one to meet. The third test could be satisfied if agency officials with knowledge of the protected disclosure were in charge of advising or effectuating the personnel action. "[B]ut then a careful scrutiny of the intensity of their motive to retaliate is necessary under test (4) to be weighed with the gravity of the misconduct charged, or inadequacy of the performance of duties.... if the evidence shows that the motive for invoking the misconduct or inadequate performance as a reason for discharge is predominantly retaliation, [that] mak[es] the asserted reasons pretextual and establish[es] the 'nexus.'" *Warren v. Department of Army,* 804 F.2d 654, 658 (Fed.Cir.1986).

The WPA simplified the nexus standard for employees by providing that the employee need only show that the whistleblowing disclosure was "a contributing factor," rather than a significant or predominant factor. The Act also heightened the burden of proof for the agency's affirmative defense from preponderance of evidence to clear and convincing evidence. These new standards for the whistleblower defense are contained in 5 U.S.C. § 1221(e):

(e)(1) ... the Board shall order such corrective action as the Board considers appropriate if the employee ... *has demonstrated that a disclosure described under section 2302(b)(8) was a contributing factor in the personnel action* which was taken or is to be taken against such employee....

(2) Corrective action under paragraph (1) *may not be ordered if the agency*

1. The provision reads:
(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—
...
(8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of—

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—
(i) a violation of any law, rule, or regulation, or
(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety
...
5 U.S.C. § 2302(b)(8) (Supp. I 1989).

*demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure.*

5 U.S.C. §§ 1221(e)(1) & (2) (Supp. I 1989) (emphasis supplied); *see also* 5 C.F.R. § 1209.7 (reiterating these standards of proof for any case involving a personnel practice that is prohibited under 5 U.S.C. § 2302(b)(8)).

## DISCUSSION

Three legal questions have been presented, all of which are issues of first impression in this court: (1) is the determination whether the employee's disclosure is protected activity under 5 U.S.C. § 2302(b)(8) a prerequisite to the determination that the activity was not a contributing factor in the personnel decision; (2) does the statute incorporate a 'per se' rule that requires an analysis of whether the deciding officials had actual or constructive knowledge of the employee's disclosure, and whether the timing of the adverse action was such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action; and (3) when the agency offers evidence to prove that the disclosure was not a contributing factor (an issue evaluated under the preponderant evidence standard), and this evidence is also relevant to the agency's affirmative defense that the same action would have been taken absent the disclosure, must the agency meet the higher 'clear and convincing' evidence standard reserved for its affirmative defense? In addition, Clark contends that substantial evidence does not support the AJ's decision.

## A.

■ There are three steps in a complete analysis of an employee's whistleblower defense to an adverse personnel action: First, is the employee's disclosure a protected 'whistleblowing' activity under 5 U.S.C. § 2302(b)(8)? Second, was the disclosure a contributing factor in the personnel action? *Id.* § 1221(e)(1). Third, can the agency prove by clear and convincing evidence that it would have taken the same personnel ac-

tion in the absence of the disclosure? *Id.* § 1221(e)(2).

■ Clark asserts that the AJ committed legal error when he failed to complete his analysis of the first step before proceeding with the second step. In effect, Clark argues that an AJ should always be required to make findings on the issue of whether a disclosure is 'whistleblowing' under § 2302(b)(8). The Board appears to have agreed with this position in an earlier case: "The administrative judge's analysis of the appellant's prima facie case was further flawed in that she made no finding on whether the appellant proved by preponderant evidence that his disclosures came within the purview of 5 U.S.C. § 2302(b)(8)." *Braga v. Department of Army,* 54 M.S.P.R. 392, 397 (1992). In *Braga,* the Board reversed the AJ's finding that Braga failed to meet the second step, but was unable to dispose of the case because the AJ had made insufficient findings with regard to the first and third steps.

When we examine the statute, we find that it does not mandate any particular sequence of analysis. Clark has not pointed to any legislative history that would require it, nor do we find any such suggestion in our review of that history.

There is no reason why an administrative judge may not assume for purposes of analysis that a petitioner has established the first step, and address the second step first. If the AJ concludes that the petitioner does not have a whistleblower defense because of a failure of proof at the second step, then it is unnecessary, and probably wasteful, to require him also to address step one. Of course, he runs the risk of having to evaluate step one on remand, as in *Braga,* should the MSPB determine that his finding on step two was in error. Nevertheless, that decision is clearly within the discretion available to a judicial forum in organizing its work. *See, e.g., Kiewit/Tulsa–Houston v. United States,* 981 F.2d 531, 534 (Fed.Cir.1992) (court need not resolve unnecessary issue), *Air Line Pilots Ass'n v. UAL Corp.,* 897 F.2d 1394, 1397 (7th Cir.1990) (discussing various meanings of "mootness;" alternative unnecessary grounds for a decision are moot), *United*

*States of Am. v. Henry,* 815 F.Supp. 325, 327 (D.Az.1993) (court need not consider second prong of test because Henry failed to meet initial prong); *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 463 n. 27 (D.N.J. 1992) (if plaintiff has established likelihood of success under one theory, court need not address alternative theories); 13A Charles A. Wright, Arthur K. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533 (2d ed.1984). There was no error here.

### B.

■ Clark next argues that the AJ committed legal error because he failed to determine whether the deciding officials had actual or constructive knowledge of the disclosures and whether they acted within such a time period that a reasonable person could conclude that the disclosures were a contributing factor in the personnel action. Clark contends that an AJ must always undertake this knowledge/timing analysis when making a determination whether an alleged whistleblowing disclosure was a contributing factor.

In practice, the Board has interpreted § 1221(e)(1) to incorporate a knowledge/timing test that allows a petitioner to prove that whistleblowing was a contributing factor by showing that "the official taking the action had actual or constructive knowledge of the disclosure and acted within such a period of time that a reasonable person could conclude that the disclosure was a factor in the personnel action. S.Rep. No. 413[, 100th Cong., 2d Sess.] 14 [ (1988) ]." *McDaid v. Department of Hous. & Urban Dev.,* 46 M.S.P.R. 416, 421 (1990); *see also, e.g., Caddell v. Department of Justice,* 52 M.S.P.R. 529, 533 (1992); *Rychen v. Department of Army,* 51 M.S.P.R. 179, 183 (1991).

There is no such knowledge/timing test in the statute, but the Board in *McDaid* relied on Senate Report No. 413, which states:

[U]nder S. 508, one of the ways an employee or the Special Counsel would be able to establish a nexus would be by showing that the official taking the personnel action knew of the disclosure and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a factor in the personnel action. The Board already has the authority to consider the taking of a personnel action within a relatively short time after a disclosure is made as an indication of reprisal. The Committee intends for the Board to use this reasonable time standard liberally because most reprisal cases are necessarily built on such circumstantial, rather than direct, evidence.

S.Rep. No. 413, 100th Cong., 2d Sess. at 14 (1988). This report accompanied S. 508,[2] which explicitly provided for the knowledge/timing test discussed in the Senate report:

(e)(1) ... the Board shall order such corrective action ... if the employee ... has demonstrated that a disclosure described under section 2302(b)(8) was a factor in the personnel action.... The employee ... may demonstrate that the disclosure was a factor in the personnel action by showing that—

*(A) the official taking the personnel action knew of the disclosure;* and

*(B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a factor in the personnel action.*

S. 508, § 1221(e)(1), 134 Cong.Rec. 19,988 (1988) (emphasis supplied). However, S. 508 was never enacted—it was pocket vetoed in October 1988 by President Reagan.[3]

S. 508 was reintroduced in January 1989 as S. 20,[4] which was the bill enacted as the WPA. But § 1221(e)(1) of S. 20 (and the WPA as passed) lacks the language of S. 508 which provided for the knowledge/timing

**2.** S. 508, 100th Cong., 2d Sess. (1988).

**3.** 135 Cong.Rec. 564 (1989) (statement of Mr. Levin).

**4.** S. 20, 101st Cong., 1st Sess. (1989).

test.[5] Thus, the discussion of knowledge and timing in S.Rep. No. 413 does not apply to the WPA, and cannot be used to read a 'per se' knowledge/timing test into the statute. *McDaid*'s reliance on the Senate report is misplaced.

The joint explanatory statement which accompanied S. 508 also discussed the knowledge/timing test. 134 Cong.Rec. 27,854 (1988). *See, e.g., McClellan v. Department of Defense*, 53 M.S.P.R. 139, 146 (1992) (relying on joint explanatory statement regarding knowledge/timing test); *Rubert v. Department of Navy*, 51 M.S.P.R. 467, 474 (1991) (same). Although this statement was reintroduced during the discussion of S. 20 in the Congressional record,[6] the portion of the statement that discusses the knowledge/timing test does not apply to S. 20 for the same reasons that the discussion of knowledge/timing in S.Rep. No. 413 does not apply.

Under 5 U.S.C. § 1221(e)(1), the employee has the burden of demonstrating that his or her whistleblowing disclosure was a contributing factor. The statute contains no 'per se' rule that knowledge of the disclosure and timing of the personnel action automatically satisfies this burden of proof. In fact, such a 'per se' rule was proposed but was deleted before enactment. There can be no clearer manifestation of Congressional intent to avoid a mandatory knowledge/timing test. *Cf. Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17–18, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981) (private remedies in addition to those explicitly provided by statute should not be implied, especially when there is clear Congressional intent to limit remedies to those provided); *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579 (Fed.Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991).

Thus, an AJ need not undertake an analysis of knowledge and timing in every case raising a whistleblower defense. This is not to say that an AJ can never consider the timing of a personnel action relative to knowledge of a whistleblowing disclosure. There may be cases in which the timing is a factor supporting a conclusion that whistleblowing was a contributing factor. As with any other piece of circumstantial evidence, this is simply one more factor for the trier of fact to consider. There was no error in the · AJ's handling of this matter.

### C.

Clark also argues that the AJ wrongly considered the propriety of the personnel decision when he concluded, under step two of the three-part analysis, that Clark had not proven her disclosures to be a contributing factor in the personnel actions. Because evidence regarding the propriety of the personnel decision would be presented in step three if the agency chooses to raise the affirmative defense that the action would have been taken absent the disclosure, Clark contends that it should be evaluated under the 'clear and convincing' evidence standard of that step, rather than the preponderant evidence standard of step two. Clark's position is supported by the Board's statement in another case:

> the administrative judge relied upon the evidence that the agency would use to show that it would have taken the action in the absence of the appellant's disclosure, to determine that the appellant did not show that retaliation was a contributing factor in the action at issue. This constitutes legal error, however, because ... the agency's evidence must be analyzed under the "clear and convincing" evidence standard.

*Caddell*, 52 M.S.P.R. at 534.

The argument is that any evidence relating to the reason for the agency's action must rise to the level of 'clear and convincing'

---

**5.** Subsections (A) and (B) of S. 508 are absent from section 1221(e)(1) of S. 20, which simply reads:

> (e)(1) ... the Board shall order such corrective action ... if the employee ... has demonstrated that a disclosure described under section 2302(b)(8) was a factor in the personnel action. ...

Note that the WPA, as enacted, contains the term "contributing factor" rather than "factor." The term was clarified at the Administration's request. 135 Cong.Rec. 4509 (1989) (statement of Mr. Levin).

**6.** 135 Cong.Rec. 4513 (1989) (Senate); *id.* at 5035 (House).

evidence, rather than a preponderance of evidence, and that this is true whether the evidence is introduced for the purpose of establishing step two (was the disclosure a contributing factor) or step three (would the agency have taken the same action absent the disclosure). The argument confuses the weight given to a particular piece of evidence with the burden of proof a party bears on a particular issue.

Step two is for Clark to prove by a preponderance of evidence. The agency may introduce any relevant and competent evidence to counter Clark's evidence, including the reason it acted. The AJ decides on the basis of all the evidence whether Clark proved her claim by a preponderance of evidence.

Step three—the agency's affirmative defense—must be proven by the agency by clear and convincing evidence. Again, the AJ, after considering all relevant and competent evidence introduced by both sides, decides whether the agency has proven its claim, this time applying the 'clear and convincing' standard. It is the overall burden of persuasion each side must carry with regard to its separate issue that is the subject of the different standards of proof, not the weight of any specific factual evidence placed upon the scale. The AJ did not err.

### D.

■ Since we find no legal error in the AJ's decision, we address Clark's contention that the decision is not supported by substantial evidence. Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Ahles v. Department of Justice*, 768 F.2d 327, 329 (Fed.Cir.1985) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). The AJ found it unlikely that Clark's complaints contributed to the RIF, because almost all occurred after the RIF action was taken, or long before Capt. Demcko and Lt. Col. Phillis had assumed their positions at SADA. The AJ further found that Capt. Demcko and Lt. Col. Phillis "credibly denied" that any of Clark's complaints contributed to the removal decision. None of Clark's complaints was personally directed against these officials, and none alleged intentional wrongdoing, abuse of authority, or gross mismanagement on their part. There was no evidence that either individual expressed irritation or a desire to retaliate against Clark.

Clark specifically challenges the AJ's finding that Capt. Demcko and Lt. Col. Phillis credibly denied that Clark's disclosures had influenced their actions. However, such credibility determinations are "virtually unreviewable." *Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986). Clark merely points to testimony suggesting that these officials were unhappy that Clark made her complaints directly to OIG, rather than going through the chain of command. We find nothing in the record that would justify reconsidering the credibility determination of the initial fact finder.

Clark also argues that the AJ should not have relied on the lack of a motive to retaliate. Clark asserts that since there is seldom direct evidence of intent to retaliate, *McDaid*, 46 M.S.P.R. at 420 (citing S.Rep. No. 413 at 14), the AJ cannot rely on the absence of such evidence to support a conclusion that the disclosures were not a contributing factor. But the opposite is equally true—the very absence of evidence to support Clark's case cannot be said thereby in some way to support Clark's case.

In *McDaid*, the MSPB found no motive to retaliate because the timing of the personnel action was almost two years after the disclosure, and McDaid's supervisor was not embarrassed by or concerned over the audit instigated by McDaid's complaint. Audits were routine, and McDaid had complained about a minor matter. Similarly, in this case, the AJ determined that Capt. Demcko and Lt. Col. Phillis were not troubled or irritated by Clark's complaints, and the complaints were about relatively minor matters, largely bureaucratic in nature. We find that there is substantial evidence in the record as a whole to support the AJ's decision.

This court must affirm a Board decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (1988).

## CONCLUSION

Because the decision of the Board contained no legal error and was supported by substantial evidence, it is

***AFFIRMED.***