NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**GARY A. STRADER,**
*Petitioner,*

**v.**

**DEPARTMENT OF AGRICULTURE,**
*Respondent.*

---

2011-3137

---

Petition for review of the Merit Systems Protection Board in consolidated case nos. SF1221090692-W-1 and SF1221090907-W-1.

---

Decided: April 5, 2012

---

APRIL HOLLINGSWORTH, Hollingsworth Law Office, LLC, of Salt Lake City, Utah, argued for petitioner. Of counsel on the brief was PAULA DINERSTEIN, Public Employees for Environmental Responsibility, of Washington, DC.

JACOB A. SCHUNK, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of

Justice, of Washington, DC, argued for respondent. On the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, TODD M. HUGHES, Deputy Director, and SONIA M. ORFIELD, Trial Attorney.

————————————————

Before NEWMAN, LOURIE, and PROST, *Circuit Judges*.

PROST, *Circuit Judge*.

Gary Strader, who was formerly employed as a Wildlife Specialist with the Wildlife Services branch of the Animal and Plant Health Inspection Service ("APHIS") division of the United States Department of Agriculture ("USDA" or "agency"), appeals from an order of the Merit Systems Protection Board ("Board") holding that the USDA did not violate the Whistleblower Protection Act ("WPA"), 5 U.S.C. § 2302(b)(8), when it allowed Mr. Strader's term appointment to expire. For the reasons discussed below, this court *affirms*.

## I. BACKGROUND

Mr. Strader began his employment with Wildlife Services in April 2005 as a seasonal employee in Richfield, Utah. Later that year, Mr. Strader was recruited by Kevin Lansford, then District Supervisor for Wildlife Services, for a position as a Wildlife Specialist in the Wildlife Services office in Ely, Nevada. Wildlife Services contracts with state agencies to perform certain services designed to prevent wildlife depredation. In Mr. Strader's case, Wildlife Services contracted with the Nevada Department of Wildlife ("NDOW") to conduct predator control operations. Mr. Strader's responsibilities included tracking and killing coyotes for the protection of mule deer and elk. On occasion, Mr. Strader was also tasked with killing other types of wildlife, including mountain

lions.  NDOW imposed a $3 surcharge on hunting licenses to fund predator control and game enhancement projects, including Mr. Strader's position.

On March 20, 2006, Mr. Strader and two of his fellow employees, Jim Buhler and Derril Fry, set out with dogs and snowmobiles to hunt coyotes and mountain lions on bighorn sheep ranges.  Two other Wildlife Services employees were hunting by plane in the area—Gilbert Temoke was piloting the plane and Shane Huseby was assisting as a gunner.  Mr. Fry radioed the plane and, among other things, advised them that the three men on the ground had heard a coyote about 500 yards away.  Mr. Fry instructed Mr. Buhler and Mr. Strader to wait for the plane to arrive, but Mr. Strader took a shot at the coyote and missed.  According to Mr. Buhler and Mr. Fry, Mr. Strader became angry with and threatened Mr. Fry for suggesting that he should have waited for the plane to arrive before shooting.

The plane then directed the ground unit toward mountain lion tracks.  When one of the snowmobiles broke a belt, Mr. Strader refused to return with a replacement belt and then left Mr. Buhler and Mr. Fry to work elsewhere for the rest of the day.  Mr. Buhler and Mr. Fry continued on snowmobiles and then on foot until they could no longer proceed because of the depth of the snow.  After returning to their trucks, the two men drove around the mountain seeking a different angle of approach.  They eventually contacted the plane, the plane landed, and Mr. Fry briefly took Mr. Temoke's position in the plane, thereby enabling Mr. Fry to lead Mr. Buhler on a new route to the mountain lion tracks when he returned to the ground.  After following the tracks to a canyon, Mr. Buhler and Mr. Fry claim to have shot two mountain lions from the ground.  Despite the fact that the agency's

permit with NDOW required them to submit a mountain lion's complete hide to NDOW, Mr. Buhler and Mr. Fry claim that they agreed to only decapitate the two mountain lions due to their level of fatigue, adverse conditions, the lateness of the hour, and concern about getting off the mountain before nightfall.

That evening, Mr. Buhler stayed at Mr. Strader's house, and reported to Mr. Strader that he and Mr. Fry had killed two mountain lions that day. Mr. Buhler also told Mr. Strader that the pelts were not recovered, but Mr. Strader admits that he did not suspect that anything improper had occurred at the time. According to Mr. Buhler, Mr. Strader stated that "he was not going to work in Nevada anymore and was going to find a job somewhere he did not have to work around Derril [Fry]."

Mr. Strader alleges that, over a year later, in September 2007, Mr. Temoke told him that he and Mr. Huseby shot the two mountain lions from a plane.[1] Mr. Temoke and Mr. Huseby deny having told Mr. Huseby that they shot the mountain lions from a plane. In October 2007,

---

[1] The Airborne Hunting Act, 16 U.S.C. § 742j-1, provides that "[a]ny person who—(1) while airborne in an aircraft shoots or attempts to shoot for the purpose of capturing or killing any bird, fish, or other animal; or (2) uses an aircraft to harass any bird, fish, or other animal; or (3) knowingly participates in using an aircraft for any purpose referred to in paragraph (1) or (2); shall be fined not more than $5,000 or imprisoned not more than one year, or both." Notably, the Airborne Hunting Act specifically does "not apply to any person if such person is employed by, or is an authorized agent of or is operating under a license or permit of, any State or the United States to administer or protect or aid in the administration or protection of land, water, wildlife, livestock, domesticated animals, human life, or crops . . . ." 16 U.S.C. § 742j-1(b)(1).

Mr. Strader spent a few days working with Joe Bennett, the Nevada Wildlife Services East District Supervisor. At that time, Mr. Strader told Mr. Bennett about the alleged aerial shooting incident involving the two mountain lions. According to Mr. Strader, Mr. Bennett angrily denied the incident and accused Mr. Strader of fabricating the story and trying to cause trouble.

In October 2008, Mr. Strader complained about the alleged aerial shootings to Gary Littauer, Assistant Western Regional Director of Wildlife Services. Mr. Littauer referred the matter to Agency Employee Relations which assigned Ken Miller to investigate the allegations. Mr. Miller interviewed all of the parties involved and obtained several statements. In approximately mid-December 2008, Mr. Miller drafted a report stating that there was no evidence to support any of Mr. Strader's allegations. At the hearing in this case, Mr. Miller testified that the primary focus of his investigation was not Mr. Strader's allegations, but rather, the investigation of unrelated allegations that Mr. Temoke had threatened Mr. Bennett. Mr. Miller also testified that he did not know if shooting mountain lions from a plane was improper.

Also in October 2008, Mr. Strader complained about the alleged aerial shootings to Jerry Smith with NDOW. Mr. Smith also undertook an investigation and in early January 2009, reached the same conclusions as Mr. Miller. Specifically, Mr. Smith informed Mr. Littauer that "there was no evidence to merit any further investigation" and "the two lion skulls . . . had most likely been disposed of and were no longer available for inspection." After learning from Mr. Littauer that the agency was not going to take any action regarding the alleged aerial shootings, Mr. Strader threatened to take his allegations to the Federal Bureau of Investigations ("FBI"), as well as the

media and animal rights groups. According to Mr. Strader, Mr. Littauer asked him to not contact the FBI and instead asked him to speak with other Wildlife Services officials. Mr. Strader claims that in order to protect any future investigation, he decided to convince Mr. Littauer that he would not contact the FBI. However, on or about February 6, 2009, Mr. Strader filed a complaint with the FBI.

Mr. Strader claims that on or about March 6, 2009, Mr. Jensen informed him that he was going to be terminated on June 30, 2009. Mr. Strader alleges that when he asked Mr. Jensen if he would still have a job after July 1 if he had not made the complaint to the FBI, Mr. Jensen nodded his head affirmatively. Mr. Strader filed a whistleblower complaint with the Office of Special Counsel ("OSC") on March 6, 2009, alleging retaliation for his disclosures regarding aerial hunting of mountain lions. In his complaint, Mr. Strader claimed that "[t]he state director advised me that my job was being eliminated June 30th if not sooner." Also in the same complaint, Mr. Strader claimed that Mr. Jensen told him that he would still be employed after July 1, 2009, if not for his aerial hunting allegations. In addition to complaining to OSC, Mr. Strader sent an email to Diedra Thiesse and Mr. Jensen on March 16, 2009, stating his belief that he was "done here June 30th." However, at the hearing in this case, Mr. Jensen testified that he never told Mr. Strader that his job would end as of June 30, 2009, or that his termination had anything to do with his aerial hunting allegations. Rather, Mr. Jensen testified that the first time he told Mr. Strader that his job was being terminated was over the phone on March 16, 2009, and that he told Mr. Strader that his job would end as of April 9, 2009. Mr. Strader acknowledges that the March 16, 2009, conversation occurred, but that Mr. Jensen did not tell

him the basis for the alleged change in the date of his termination.

On April 7, 2009, Mr. Strader was injured while preparing to return his work equipment to Mr. Jensen. Mr. Strader filed a workers' compensation claim based on the accident and later filed a second whistleblower complaint with the OSC, alleging that the agency had interfered with his workers' compensation claim and delayed processing his final pay in retaliation for his disclosures. On April 22, 2009, the OSC informed Mr. Strader that it was closing its investigation into his first complaint and that he could seek corrective action from the Board. Similarly on June 9, 2009, the OSC closed its investigation into Mr. Strader's second whistleblower complaint. Mr. Strader filed an Individual Right of Action ("IRA") with the Board on June 10, 2009, regarding his termination, and on August 21, 2009, he filed a second IRA alleging retaliation based on Mr. Jensen's interference with his workers' compensation claim. The two IRAs were consolidated for a hearing on March 11, 12, and 15, 2010, before the administrative judge. *Strader v. Dep't of Agric.*, Nos. SF1221090692-W-1, SF1221090907-W-1, slip op. at 1-2 (M.S.P.B. May 25, 2010) ("*Initial Decision*").

On May 25, 2010, the administrative judge found that Mr. Strader did not make disclosures entitled to protection under the WPA. Specifically, the administrative judge found that while Mr. Strader reasonably believed that shooting mountain lions from a plane was illegal,[2]

---

[2]    As the administrative judge explained, it is undisputed that employees of the Wildlife Services are "expressly authorized agents of the United States tasked with the administration or protection of wildlife" and therefore "it is unclear whether the use of aircraft by such employees to shoot mountain lions would, in fact, violate

Mr. Strader's belief that his colleagues had engaged in such activity was not reasonable. Additionally, the administrative judge found that it was unlikely that Mr. Huseby and Mr. Temoke would have confessed to shooting mountain lions from a plane, and even if they had confessed, Mr. Strader should have recognized that it was a "tall tale," especially given the testimony of multiple expert witnesses that shooting mountain lions from a plane was next to impossible. Accordingly, the administrative judge found that Mr. Strader had not made protected disclosures. Assuming, arguendo, that Mr. Strader's disclosures were indeed protected, the administrative judge found that Mr. Strader effectively established that his disclosures were a contributing factor in the agency's decision to take a personnel action against him because he was terminated approximately eighteen months after his initial disclosure. But the administrative judge went on to find that the agency established by clear and convincing evidence that it would have terminated Mr. Strader's position even in the absence of his disclosures. The administrative judge found that Mr. Strader's termination was due to the expiration of his term appointment, which corresponded with the "long-expected draw down of state funding for Project 17," the predator control project that Mr. Strader was hired to work on. *Id.* at 29. Additionally, the administrative judge found that the "relevant agency officials possessed little if any motive to retaliate" and that "the agency

the terms of the Airborne Hunting Act." *Initial Decision* at 4. That said, Mr. Littauer testified that Wildlife Services operates under a permit from NDOW for aerial hunting and mountain lions had not, at the time of the alleged incident, been approved under the permit for aerial hunting. Mr. Littauer also testified that Mr. Strader's allegations, if true, would have represented "a violation of agency policy at the very least." *Id.*

demonstrated that its processing of Mr. Strader's final pay and 2009 workers' compensation claim was unaffected by his whistleblowing allegations." *Id.*

Mr. Strader petitioned the Board for review and on March 24, 2011, the Board denied his petition, finding that it did not meet the Board's regulatory criteria. *Strader v. Dep't of Agric.*, Nos. SF1221090692-W-1, SF1221090907-W-1, 116 M.S.R.P. 352 (March 24, 2011) (Table). Thus, the administrative judge's initial decision became the final decision of the Board. On May 20, 2011, Mr. Strader sought review in this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## II. DISCUSSION

This court's review of decisions by the Board in whistleblower and other cases is limited. We will only overturn a decision of the Board if it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## A

A "protected disclosure" is a disclosure which "an employee . . . reasonably believes evidences (i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8)(a). To establish a protected disclosure

under the WPA, an employee must demonstrate by a preponderance of the evidence that he disclosed information that he reasonably believed evidenced a violation of any law, rule, or regulation. *Id.* § 2302(b)(8). A reasonable belief exists where "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence" such wrongdoing. *Lachance v. White*, 174 F.3d 1378 (Fed. Cir. 1999). The employee need not prove an actual violation to support a reasonable belief. *Kahn v. Dep't of Justice*, 618 F.3d 1306, 1315 (Fed. Cir. 2010).

In addition to establishing a protected disclosure, an employee seeking relief under the WPA must show that his disclosure was a contributing factor in the adverse action. 5 U.S.C. § 1221(e)(1). Satisfaction of the "knowledge/timing" test—i.e., whether the official taking the personnel action knew of the disclosures and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action—establishes as a prima facie matter that the disclosure is a contributing factor to the personnel action. *See Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357, 1361 (Fed. Cir. 1998). Here, the parties do not dispute that Mr. Strader has satisfied the "knowledge/timing" test and thereby established that his disclosures were a contributing factor in the agency's decision to take a personnel action against him.

If the employee establishes that a protected disclosure was a contributing factor, the burden shifts to the agency to establish by clear and convincing evidence that it would have taken the action even in the absence of the protected disclosure. 5 U.S.C. § 1221(e)(2); *Kewley,* 153 F.3d at

1363. Here, the administrative judge determined that the agency established by clear and convincing evidence that it would have terminated Mr. Strader's position in the absence of his disclosures. Therefore, even if Mr. Strader is correct that he made a protected disclosure, he is not entitled to relief if substantial evidence supports the administrative judge's determination that the agency proved it would have terminated him in the absence of his disclosures.

In assessing whether an agency has met its burden, the Board looks at three factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are otherwise similarly situation. *See Carr v. Social Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). Mr. Strader attacks the evidence and the administrative judge's reasoning with respect to all three factors.

B

As noted above, the administrative judge not only found that there were no protected disclosures here, but also concluded that even if Mr. Strader's disclosures were protected, the agency proved by clear and convincing evidence that it still would have terminated Mr. Strader in the absence of his disclosures. On appeal, Mr. Strader argues that the administrative judge's determination that he did not make protected disclosures is unsupported by substantial evidence. Namely, Mr. Strader contends that the administrative judge gave undue weight to certain witnesses' testimony over others, ignored inconsistencies in testimony, and disregarded contradictory evidence.

For the reasons discussed below, we conclude that substantial evidence supports the administrative judge's determination that the agency proved it still would have terminated Mr. Strader in the absence of his disclosures. Accordingly, we need not reach the issue of whether Mr. Strader in fact made protected disclosures.

The question of whether Mr. Strader's employment ended as a result of his aerial hunting allegations appears to turn, in large measure, on Mr. Strader's employment status. In addressing the first *Carr* factor, the agency contends that it presented strong evidence to the administrative judge that Mr. Strader was a term employee whose employment was limited to the duration of Project 17. On the other hand, Mr. Strader asserts that he was not a term employee, but rather, a permanent employee. According to Mr. Strader, the applicable regulation provides that temporary appointments are for a year or less, and may be extended for not more than an additional year. *See* 5 C.F.R. § 213.104(b)(1) ("Agencies may make temporary appointments for a period not to exceed 1 year . . . . Except as provided in paragraph (b)(3) of this section, agencies may extend temporary appointments for no more than 1 additional year (24 months of total service)."). If extended beyond twenty-four months, Mr. Strader asserts that temporary appointments become permanent. Here, Mr. Strader had been in his position for four years at the time of his termination and therefore, argues that he should have been treated as a permanent employee.

Mr. Strader's reliance on 5 C.F.R. § 213.104(b)(1) is unavailing. To be sure, 5 C.F.R. § 213.104(a)(1) explains that "temporary appointments . . . are made for a specified period not to exceed 1 year and are subject to the time limits in paragraph (b) of this section." However,

"[t]ime-limited appointments made for *more than 1 year* are not considered to be temporary appointments, and are not subject to these time limits." *Id.* (emphasis added). Beginning on January 8, 2006, Mr. Strader received a series of term appointments, not to exceed ("NTE") thirteen months. Because his appointments were for thirteen months, the time limits in 5 C.F.R. § 213.104(b)(1) do not apply.[3]   Moreover, it is undisputed that all of Mr. Strader's appointments "were created to perform predator management duties pursuant to Project 17." *Initial Decision* at 20. "It is further undisputed that from its inception in 2005, Project 17 was expressly budgeted as a '5-year project,' ending . . . June 30, 2009." *Id.* While Mr. Strader claims that he was unaware that his job would end with Project 17 and that agency policy was to offer additional work to good employees, the administrative judge noted that on August 24, 2008, Mr. Strader sent an email to Mr. Bennett seeking a new position and acknowledging that "[t]hese NDOW projects are touchy deals" and that he "want[ed] a job that is secure." *Id.* at 28. For these reasons, substantial evidence supports the administrative judge's determination that Mr. Strader's tenure was never transformed into a permanent position,

---

[3]   Mr. Strader also relies on the testimony of Teres Culver, a former budget analyst at Wildlife Services. At the hearing, Ms. Culver testified that after an NTE employee has been with the agency for two years, NTE dates are no longer required and even though the NTE employee is not technically a permanent employee, the NTE employee is considered and treated like a permanent employee. However, Ms. Culver's testimony is contradicted by the fact that throughout his four years of employment, Mr. Strader continued to receive term appointments with specific NTE dates.

but always remained contingent upon the duration of Project 17.

It is true that Mr. Strader's term was allowed to expire a few months before the end of Project 17. Indeed, Mr. Strader's final thirteen-month appointment expired on April 9, 2009, while Project 17 officially ended on June 30, 2009. The administrative judge, however, relied on substantial evidence supporting the agency's explanation for the gap between these two dates. Mr. Jensen testified that the agency received funding from the State of Nevada through a reimbursable contract and that the agency was required to submit reimbursement requests quarterly. Accordingly, Mr. Jensen wished to complete the project in time to submit a request for reimbursement before the end of the quarter. *Initial Decision* at 21, n.5. Mr. Bennett testified that the agency ended two other projects early as well. *Id.* at 21.

Mr. Strader also argues that even if he were considered a term employee, he would not have been terminated absent his disclosures because the agency had new work for him to do and funding to pay him. Mr. Strader notes that the $3 surcharge for hunting licenses that funded his position continued and that the 2010 budget provided for a new Wildlife Specialist position for a new aerial project (Project 22), which is the same job that Mr. Strader performed on Project 17. However, the 2010 budget was not promulgated until August 2009, while Mr. Strader's employment ended in April 2009. What is more, Mr. Strader's position was contingent upon NDOW contracting with and giving money to Wildlife Services; NDOW's $3 surcharge did not automatically provide funds with which Wildlife Services could extend Mr. Strader's appointment. Although Mr. Strader argues that he could have been assigned to work as "ground crew" on aerial

Project 22, Mr. Bennett and Mr. Jensen testified that no one has ever been appointed to perform such a specialized role. Rather, Project 22 funding was used to cover ground crew work by multiple individuals in different positions. Additionally, the administrative judge relied on undisputed testimony by Mr. Jensen that at least some intermittent wildlife duties associated with aerial Project 22 were already being performed by a retired state employee. At bottom, substantial evidence supports the administrative judge's implicit determination that even absent his disclosures, Mr. Strader would not have been offered a new position on Project 22.

With regard to the second *Carr* factor, Mr. Strader argues that the agency did not prove a lack of retaliatory motive by clear and convincing evidence. Mr. Strader contends that even though Mr. Jensen and Mr. Bennett did not directly participate in the alleged aerial shooting, they were implicated as managers of the individuals involved and therefore had a retaliatory motive in allowing Mr. Strader's term to expire. Mr. Strader also complains that Mr. Miller's investigation into the alleged aerial shootings was insufficient and is therefore evidence of retaliation. Additionally, Mr. Strader argues that his January 2009 threat to contact the FBI supports the existence of a retaliatory motive. Finally, Mr. Strader alleges that Mr. Jensen openly acknowledged during a March 6, 2009, conversation that Mr. Strader was being terminated as result of his disclosures.

Substantial evidence, however, supports the administrative judge's determination that the agency did not have a strong retaliatory motive to allow Mr. Strader's term to expire. As an initial matter, it is unlikely that either Mr. Jensen or Mr. Bennett was implicated by Mr. Strader's allegations. Unlike *Carr*, where the "protected disclo-

sures related to the management of the office and constituted criticisms of [one of the managers who was] . . . eventually removed from the position" he held, Mr. Strader did not make broad allegations against the agency or suggest any link between the alleged aerial shooting and poor management.  185 F.3d at 1322-23.  Nevertheless, Mr. Bennett and Mr. Jensen investigated Mr. Strader's allegations several times over.  Mr. Miller's was just one of the investigations conducted.  Moreover, the record shows that Mr. Miller was an experienced investigator with twenty years of experience in the military as an intelligence officer, an interrogator, and an investigator.  Additionally, Mr. Miller testified that Mr. Jensen and Mr. Bennett did not direct his investigation and he was not controlled in any way by the agency.  But even setting Mr. Miller's findings aside, none of these inquiries, including one undertaken by NDOW, uncovered any evidence to support Mr. Strader's claim.

The timeline of events also supports the administrative judge's findings with regard to retaliatory animus.  Mr. Bennett and Mr. Jensen learned of Mr. Strader's accusations in December 2007, but three months later, in March 2008, Mr. Strader received the same mid-year performance appraisal that he had received in prior years, and his appointment was renewed for another thirteen-month period.  And in August 2008, Mr. Strader thanked Mr. Bennett for an "award and gifts" he had received in recognition of his superior performance in hunting coyotes.  In response to this evidence, Mr. Strader contends that it was his February 2009 complaint to the FBI that triggered the agency's retaliatory animus.  However, the administrative judge noted that both Mr. Bennett and Mr. Jensen testified that they were unaware that Mr. Strader had contacted the FBI until April 8, 2009, the day before his term expired.  Mr. Strader suggests that Mr. Littauer

could have informed Mr. Jensen and Mr. Bennett that in a January 2009 phone conversation, Mr. Strader threatened to contact the FBI. However, there is no evidence in the record that Mr. Littauer ever told Mr. Jensen or Mr. Bennett about Mr. Strader's threat to report the alleged aerial shootings to the FBI. In fact, Mr. Strader took affirmative steps to convince Mr. Littauer that he was not going to report the alleged aerial shootings to the FBI. While the administrative judge considered Mr. Strader's claim that on March 6, 2009, Mr. Jensen indicated to Mr. Strader that he was being terminated as result of his aerial hunting allegations, the administrative judge ultimately found that Mr. Strader's testimony on the issue was less credible than Mr. Jensen's testimony, especially given that Mr. Strader's term was renewed the previous year despite his aerial hunting allegations. This court has "held that 'an evaluation of witness credibility is within the discretion of the Board and that, in general, such evaluations are "virtually unreviewable" on appeal.'" *Kahn*, 618 F.3d at 1313 (citing *King v. Dep't of Health & Human Servs.*, 133 F.3d 1450, 1453 (Fed. Cir. 1998) (quoting *Clark v. Dep't of the Army*, 997 F.2d 1466, 1473 (Fed. Cir. 1993))). Mr. Strader notes that deference is limited to situations where "the administrative judge's credibility determination is based on observations of the demeanor of a testifying witness such that the administrative judge's findings were explicitly or implicitly based on such observation of demeanor." *Haebe v. Dep't of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). Regardless, however, of whether the administrative judge's credibility determination here is demeanor based, it is supported by substantial evidence in the record.

With regard to the third *Carr* factor, Mr. Strader argues that there is no evidence of similar action taken against employees who are not whistleblowers. Mr.

Strader is mistaken. As noted by the administrative judge, the agency took similar action against another term employee, Bill Fry (not to be confused with Derril Fry discussed above). Even though there is no evidence that Bill Fry engaged in any whistleblowing activity, his term was allowed to expire at the end of his project in March 2009. Mr. Strader contends that Bill Fry is not an appropriate comparator because, according to Ms. Culver, Mr. Jensen did not like Bill Fry and had been seeking to get rid of him. Yet other evidence, including Mr. Jensen's own testimony, contradicts Ms. Culver's statements and her credibility on this issue. Accordingly, substantial evidence supports the administrative judge's determination that similar action was taken against a similarly situated employee who was not a whistleblower.

Lastly, Mr. Strader complains that the agency did not prove that Mr. Jensen did not interfere with his workers' compensation claim and final pay. Mr. Strader's theory is based on Ms. Thiesse's testimony that Mr. Jensen instructed her "not to remind Gary [Strader] about" the paperwork. Ms. Thiesse also testified that Mr. Jensen took Mr. Strader's file from her, which she claims was unusual. Additionally, Ms. Thiesse expressed concern that Mr. Jensen controverted Mr. Strader's claim with an attached letter rather than simply checking the box on the form. She also told Mr. Strader that "I think [Mr. Jensen]'s trying to make it seem like you never sent it back." With respect to his final pay, Mr. Strader notes that he sent several emails to Mr. Jensen in May 2009 inquiring as to the status of his final payment. On May 18, 2009, Mr. Strader sent another email to Mr. Jensen, but this time, he copied Mr. Littauer. Mr. Strader's final payment was processed that same day, almost a month after the payment was initially requested. According to Mr. Strader, Mr. Jensen's delay in responding to his

emails shows that Mr. Jensen interfered with his final payment.

We conclude, however, that substantial evidence supports the administrative judge's determination that Mr. Jensen did not interfere with Mr. Strader's workers' compensation claim and final pay. The record shows that Mr. Jensen was advised to controvert the claim by a workers' compensation specialist, Marquess Commodore. Ms. Commodore based her advice on the presence of a number of fraudulent indicators, including the fact that the injury occurred two days before Mr. Strader's last day of employment, that Mr. Jensen had trouble reaching him after the injury, and that Mr. Strader had filed a number of previous claims. But irrespective of Ms. Theisse's refuted testimony, the record shows that Mr. Strader's paperwork was received by the agency, and then timely forwarded to the Department of Labor on April 30, 2009. On May 5, 2009, the claim was approved by the Department of Labor. Indeed, this timeline of events supports the administrative judge's finding that "the agency's handling of the appellant's [workers' compensation] claim was unexceptional, and unaffected by his whistleblowing activity." *Initial Decision* at 31.

Mr. Strader's contention that the administrative judge erred in finding that Mr. Jensen did not interfere with his final pay is similarly flawed. Emily Carlson, a human resources processing assistant, processed Mr. Strader's final pay. She testified that at the time of the processing, she was unfamiliar with any of the individuals in Mr. Strader's supervisory chain. Ms. Carlson also testified that there was nothing unusual about the processing of the payment. In fact, the process took approximately the same time as the processing for another employee whose appointment lapsed during this same

period, Bill Fry. Tellingly, an audit was performed that resulted in an *increase* in Mr. Strader's payment beyond what he had expected. In sum, substantial evidence supports the administrative judge's finding that Mr. Strader's allegations did not affect the agency's processing of Mr. Strader's finally payment.

We have also considered Mr. Strader's remaining arguments and find them unpersuasive. Accordingly, we hold that the administrative judge's finding that the agency proved it would have allowed Mr. Strader's term to expire in the absence of his disclosures is supported by substantial evidence. We therefore affirm the Board's conclusion that the agency did not violate the WPA when it allowed Mr. Strader's term to expire.

## III. CONCLUSION

For the foregoing reasons, the decision of the Board is affirmed.

## COSTS

Each party shall bear its own costs.

## AFFIRMED