NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**GEORGE DUGGAN,**
*Petitioner,*

v.

**DEPARTMENT OF DEFENSE,**
*Respondent.*

---

2012-3025

---

Petition for review of the Merit Systems Protection Board in Case No. SF1221100159-W-1.

---

Decided: June 13, 2012

---

GEORGE DUGGAN, of Newman, California, pro se.

BARBARA E. THOMAS, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for respondent. With her on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and TODD HUGHES, Deputy Director.

---

Before RADER, *Chief Judge*, O'MALLEY and WALLACH, *Circuit Judges*.

PER CURIAM.

George Duggan, a senior auditor with the Defense Contract Audit Agency ("DCAA") of the Department of Defense, appeals from an order of the Merit Systems Protection Board ("Board") holding that the agency did not violate the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8) ("WPA"), by (1) suspending Mr. Duggan without pay for two days in 2003 or (2) initially giving Mr. Duggan a performance rating of "unacceptable" in 2008 before revising that rating to "exceeds fully successful." For the reasons discussed below, this court *affirms* the Board's determinations.

## BACKGROUND

Mr. Duggan during the early 2000s was partly responsible for the auditing of the accounts of Chemical Systems Division, a component of federal contractor Pratt & Whitney. On September 13, 2002, Mr. Duggan faxed to a DCAA specialist a copy of a spreadsheet prepared by Chemical Systems personnel. Before faxing the spreadsheet, which listed potential losses that Chemical Systems might incur, Mr. Duggan handwrote on it several comments insinuating that the numbers indicated Chemical Systems had misled the Government regarding contract pricing.[1]

---

[1]    Specifically, Mr. Duggan wrote "set-up reserve for [Defective Pricing] we will lose . . . pay [Government] for [Defective Pricing] when we lose, in no way more than the $162,482 we know we scammed the [Government]; reverse the rest on successful negotiation & in any case give me a raise, VP of [Government] relations."

Although Mr. Duggan sent this altered copy of the spreadsheet to a DCAA employee, he used a Chemical Systems fax machine to do so. He then left the annotated spreadsheet in the fax machine, where it was later discovered by a Chemical Systems employee. In October 2002, Mary Estes, Mr. Duggan's supervisor, received a complaint from a Pratt & Whitney employee; Ms. Estes prepared a memorandum in which she summarized the various complaints that had been relayed to her and expressed certain concerns of her own about Mr. Duggan's behavior toward contractor personnel. On November 21, 2002, the manager of the DCAA branch where Mr. Duggan was employed, James P. Hayes, informed Mr. Duggan in a written memorandum that he was proposing that Mr. Duggan be suspended without pay for two days. He cited two reasons for the proposed suspension: (1) "[m]aking inappropriate comments about a fellow auditor to contractor representatives," and (2) "[m]aking disrespectful, offensive comments to contractor representatives."

Mr. Duggan responded to Mr. Hayes's memorandum by writing a letter to Karen Taylor, Mr. Hayes's supervisors and the DCAA official who would make the final decision on the proposed suspension. In that memorandum, Mr. Duggan asserted that Chemical Systems was systematically withholding a wide variety of documentation without which he could not effectively audit the contractor's finances and contract pricing. Additionally, he admitted making a number of disparaging comments, both about a fellow auditor and to contractor representatives.

Mr. Duggan was suspended without pay on January 16 and January 17, 2003. Mr. Duggan filed a grievance concerning the suspension, but the grievance was denied.

In May 2003, Mr. Duggan refused to sign a Statement of Independence, a standard form by which each DCAA auditor was to aver that he or she was "free both in fact and in appearance from personal, external, and organizational impairments to independence." Mr. Duggan claimed that he operated under an external impairment because Chemical Systems refused to provide him with the documentation he believed necessary to permit him to conduct an adequate audit. DCAA officials informed Mr. Duggan both that they did not believe he was externally impaired and that he could no longer serve as an auditor assigned to Chemical Systems if he did not sign the independence statement, but Mr. Duggan continued to refuse to sign. Consequently, he was transferred from DCAA's Silicon Valley Branch to the Peninsula Branch Office on May 25, 2003. Mr. Duggan filed a grievance concerning the transfer on June 9, 2003, but his grievance was denied. In June 2003, Mr. Duggan's promotion appraisal was lowered from a 75 rating to a 66.

In 2007, Mr. Duggan spent roughly ten months performing contractor audits in Iraq. In 2008, after his return to DCAA's Peninsula Branch Office in California, Mr. Duggan began sending detailed letters to David Rapallo, chief investigative counsel for the House of Representatives's Committee on Oversight and Government Reform. In those letters he complained of the "dysfunctional audit oversight" provided by DCAA in general and contended that DCAA's performance in Iraq was particularly "egregious." He provided numerous examples of what he called "systemic deficiencies" in DCAA's work in Iraq.

When Mr. Duggan left Iraq at the end of 2007, he received an "exit" performance appraisal from his supervisor there, who rated his work "outstanding." On July 30, 2008, several months after Mr. Duggan's return to the

DCAA Peninsula Branch Office, his supervisor signed an appraisal of his job performance from December 2, 2007 through June 30, 2008, rating that performance "unacceptable."

Mr. Duggan filed a grievance, arguing that the poor rating he received was unfounded and that he should have received an annual performance evaluation that incorporated his rating of "outstanding" upon his exit from Iraq, rather than an interim evaluation that addressed only the work he had performed since his return from Iraq. He also alleged that the negative evaluation was a form of prohibited retaliation for his protected disclosures to Congress.

The regional audit manager, John Doherty, after examining the issue, decided that Mr. Duggan's rating for the period in question should have been "fully successful," and that Mr. Duggan should have been issued an annual performance evaluation that combined his two evaluations. Accordingly, Mr. Duggan's performance appraisal for December 2007 through June 2008 was reissued with the revised rating of "fully successful," and Mr. Doherty issued an annual evaluation of Mr. Duggan's performance that rated it as "exceeds fully successful."

In 2009, Mr. Duggan filed a Complaint with the United States Office of Special Counsel ("OSC") in which he alleged that the DCAA had retaliated against him in violation of the WPA. In two letters dated July 2, 2009, and September 24, 2009, the Special Counsel declined to present Mr. Duggan's allegations to the Board. Mr. Duggan filed a Complaint with the Board on November 22, 2009. He divided his allegations into "cases," alleging (1) that his faxed notes were protected disclosures under the WPA and that his two-day suspension without pay in

2003 was retaliation for sending the notes ("Case A")[2]; and (2) that the "unacceptable" rating was retaliation for his communicating with Congress, another protected disclosure ("Case B").[3]

The administrative judge ("AJ") issued an initial decision in which he found in the agency's favor with respect to Cases A and B.  First, the AJ found that, although Mr. Duggan's faxed spreadsheet constituted a protected disclosure and a contributing factor to Mr. Duggan's suspension, the agency, nevertheless, had proven by clear and convincing evidence that it would have suspended Mr. Duggan even in the absence of any protected disclosure. With regard to the letters Mr. Duggan sent to high-level DCAA personnel and his congressman, the AJ found that Mr. Duggan did not submit those particular allegations to OSC and, therefore, failed to exhaust his administrative remedies as to these letters.[4]

Furthermore, the AJ determined that a promotion appraisal does not constitute a personnel action governed by the WPA. Even if it did, the AJ held Mr. Duggan's claim would still fail because the decrease in the appraisal would have occurred even if no protected disclo-

---

[2]    In a later filing, Mr. Duggan expanded Case A to include an allegation that his grievance of his suspension and his complaint to his congressman about it constituted protected disclosures.

[3]    Mr. Duggan brought a third "case." Case C concerned an unsuccessful attempt by one of Mr. Duggan's supervisors to suspend him in December 2008.  Because Case C is not at issue on appeal to this court, it will not be discussed further.

[4]    The AJ also found that, even if the claims had been exhausted, they would not succeed. The agency, according to the AJ, would have denied Mr. Duggan's grievance of his suspension even in the absence of any protected disclosure.

sure had been made. Similarly, the AJ found Mr. Duggan's transfer would have been ordered in the absence of any protected disclosure.

With regard to Case B, the AJ determined that Mr. Duggan failed to demonstrate that any retaliation on the basis of protected disclosures to House Investigative Counsel had occurred, because he had not proven that the agency officials whom he allegedly informed of the disclosures—his branch manager, Ellen Hoffer, and his temporary supervisor, Linda Lombardo—in fact knew of the disclosures in question. Therefore, the AJ held the disclosures could not have been "a contributing factor in [Mr. Duggan's] subsequent performance rating or other personnel actions."

Mr. Duggan timely filed for full Board review of the initial decision. The Board rejected his objections to the AJ's factual findings and upheld the initial decision. Mr. Duggan then petitioned for review by this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## DISCUSSION

This court's review of decisions by the Board in whistleblower and other cases is limited. We will overturn a decision of the Board only if it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. National Labor Relations Bd.*, 305 U.S. 197, 229 (1938).

A "protected disclosure" is a disclosure which "an employee . . . reasonably believes evidences (i) a violation of

any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8)(A). To establish a protected disclosure under the WPA, an employee must demonstrate by a preponderance of the evidence that he disclosed information that he reasonably believed evidenced a violation of any law, rule, or regulation. *Id.* § 2302(b)(8). If the employee establishes that a protected disclosure was a contributing factor, the burden shifts to the agency to establish by clear and convincing evidence that it would have taken the action even in the absence of the protected disclosure. 5 U.S.C. § 1221(e)(2). In assessing whether an agency has met its burden, the Board looks at the three factors enumerated in *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318 (Fed. Cir. 1999): (1) "the strength of the agency's evidence in support of its personnel action"; (2) "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision"; and (3) "any evidence that the agency takes similar actions against employees who are not whistle-blowers but who are otherwise similarly situated" ("*Carr* factors").

Mr. Duggan argues that the Board erred in that it failed to correctly assess evidence, failed take into account important evidence, relied on conflicting evidence, and relied on false evidence. He also argues that the Board improperly required him to prove his supervisors had more than constructive knowledge of his protected disclosures to Congress.[5]

---

[5] Mr. Duggan also contends that the Board incorrectly concluded he had failed to prove exhaustion of the following claims: claims that his letter to his congressman and his grievance letter complaining of his 2003 suspension contained protected disclosure and either those

The Government argues that the "[B]oard's factual findings are based on substantial record evidence and Mr. Duggan's arguments to the contrary are mere disagreements with the [B]oard's credibility determinations and weighing of the evidence." The Government also argues that Mr. Duggan does not offer "any countervailing evidence" in conflict with the evidence relied upon by the Board. Finally, the Government contends that Mr. Duggan's arguments as to the wrong legal standard applied by the Board are in fact "another expression of his disagreement with the [B]oard's factual findings."

The burden of establishing a reversible error in a Board decision rests upon the petitioner. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). If substantial evidence supports the Board's factual findings, this court must affirm. 5 U.S.C. § 7703(c); *Hayes v. Dep't of Navy*, 727 F.2d 1535, 1537 (Fed. Cir. 1984). Regarding credibility determinations, we defer to the Board. *Kahn v. Dep't of Justice*, 618 F.3d 1306, 1313 (Fed. Cir. 2010) ("[A]n evaluation of witness credibility is within the discretion of the Board and . . . in general, such evaluations are 'virtually unreviewable' on appeal") (quoting *King v. Health & Human Serv.*, 133 F.3d 1450, 1453 (Fed. Cir. 1998). The court has independently reviewed the Board's fact findings and has concluded, for

---

disclosures or those in the faxed spreadsheet resulted in his transfer; the lowering of the promotion appraisal; and the denial of his grievance of his suspension. However, Mr. Duggan failed to submit to the Board any documents that he had presented to OSC. The Board noted that "[h]ere, [Mr. Duggan] has not shown, nor does the record reflect, that he ever brought these additional disclosures and personnel actions to the attention of the OSC, whose detailed responses to him do not mention those issues." Because of the lack of evidence in the record, the Board's determination is reasonable.

the reasons explained below, that substantial evidence supports the findings of the Board.

First, with regard to Case A, the AJ determined that the spreadsheet faxed by Mr. Duggan was a protected disclosure under the WPA and was a contributing factor that led to his two-day suspension. However, applying the *Carr* factors, the AJ determined that the agency had shown, by clear and convincing evidence, that it would have taken the same personnel action despite the disclosure. The AJ found that other DCAA employees had been disciplined for making disparaging remarks about contractors absent whistleblower allegations, that the agency presented significant other evidence unrelated to whistle blowing activity in support of its personnel action, and that the main concern the agency had with regard to the fax was not with its contents but "the negligent fashion by which [the fax was sent], and the disparaging and unprofessional nature of the comments on it." The AJ also found that "[a]t the hearing, [Mr. Duggan] admitted to making the disparaging comments that were the basis for his discipline . . . but similarly contended that they were justified because they were factual." In short, substantial evidence supports the AJ's finding that "[b]ased on the strong evidence the agency presented in support of its reasons for taking the action, as well [as] the fact that appellant has not shown evidence that the deciding official . . . had any retaliatory motive, I am left with the firm conviction that, even in the absence of [Mr. Duggan's] disclosures, the agency would have issued [him] the suspension under all the circumstances."

Similarly, the AJ found that the agency had shown by clear and convincing evidence that it would have lowered the Appellant's promotion appraisal for the period in question and, separately, would have reassigned him absent Mr. Duggan's disclosures. The AJ relied on the

testimony of the Regional Audit Manager with regard to Mr. Duggan's promotion appraisal who testified that "he was aware of the misconduct underlying [Mr. Duggan's] suspension, and that he factored that misconduct into his promotion appraisal score . . . [and that] he was not aware of appellant's alleged disclosures." He also testified that "misconduct such as making disparaging remarks about colleagues and contractors is considered in assessing a promotion appraisal because it is indicative of whether or not the employee can foster good relations amongst colleagues and function as part of a team." With regard to Mr. Duggan's reassignment, the AJ relied on testimony that Mr. Duggan was reassigned not due to his disclosures but because he refused to sign the required auditor independence statement. The record contains substantial evidence to support the AJ's finding that the personnel actions taken by the agency would have been taken absent Mr. Duggan's disclosures.

With regard to Case B, the AJ determined that Mr. Duggan's "communications with the House Investigative Counsel reveals that they clearly constituted protected disclosures"; however, the AJ also determined that Mr. Duggan's claims failed because he had not established that the officials he alleges to have retaliated against him had any particular knowledge of his protected disclosures. The AJ relied in part on Mr. Duggan's testimony at trial that his comments to the pertinent officials "consisted of such warnings that outside oversight authorities were interested in looking at DCAA closely, but that he did not tell them that he had made any complaints or disclosures to Congressional personnel or anyone else." The AJ further relied on the testimony of Mr. Duggan's supervisors—Ms. Hoffer and Ms. Lombardo—that they were unaware Mr. Duggan had discussions with anyone outside the agency.

Two inferences can be drawn from the record. One inference is that, notwithstanding the testimony of Mr. Duggan and his supervisors, the supervisors understood that Mr. Duggan was engaging in, or was prepared to engage in, whistle-blowing activity. Mr. Duggan attended several meetings with his supervisors during which he gave repeated warnings that oversight authorities were watching the agency. At the time Mr. Duggan warned his supervisors about oversight activity, the Government Accountability Office ("GAO") was investigating the agency's practices and preparing to issue a report. Mr. Duggan's colleague, auditor Cecilia Nguyen, knew of the GAO investigation and forthcoming report. Because rank-and-file employees such as Ms. Nguyen knew of that oversight activity, it is likely that supervisors would have been aware of it as well. Additionally, Ms. Hoffer acknowledged that she was aware of oversight activity when she testified that she had contact with the Defense Department's Inspector General ("IG"). Thus, one may infer that, even if Mr. Duggan's supervisors did not know of his communications with Congress, they may well have suspected that he was involved with various other oversight activities that were occurring at the time.

The other possible inference is the one that the AJ drew: that the supervisors had no specific knowledge of Mr. Duggan's whistle-blowing communications, whether those communications were with Congress or any other office or agency outside DCAA. Indeed, the evidence indicates that the supervisors could have perceived that Mr. Duggan's warnings about oversight authorities' scrutiny of DCAA were references only to the already-pending GAO and IG investigations, with which Mr. Duggan apparently had no involvement. On this point, the AJ noted that "[b]oth Ms. Hoffer and Ms. Lombardo testified that they were unaware that the appellant had

had any discussions with anyone outside the agency regarding alleged malfeasance and that they did not consider him to have disclosed any waste, fraud or violations of law during their meetings." And, the AJ credited this testimony in reaching his conclusion that Mr. Duggan had failed to present adequate evidence that his supervisors were aware of or motivated by any whistle-blowing activity.

An employee may demonstrate that a protected disclosure was a contributing factor in the personnel action with circumstantial evidence by showing that (1) "the official taking the personnel action knew of the disclosure"; and (2) "the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action." 5 U.S.C. § 1221(e)(1). And, proof that an official knew of a protected disclosure may be inferred from the facts of the case even if the official did not personally witness the whistle-blowing activity. *See Massie v. Dep't of Transp.*, 114 MSPR 155, 160 ¶ 15 (2010).

While we might view the record differently than the AJ did under a less deferential standard of review, and draw a different inference from the testimony presented, Congress has limited our review to a substantial evidence inquiry. 5 U.S.C. § 7703(c). That standard of review requires deference to the AJ's fact finding and credibility determinations. *Hayes*, 727 F.2d at 1537; *Kahn*, 618 F.3d at 1313. Because the record contains sufficient evidence to support the AJ's finding that Mr. Duggan's supervisors were unaware of his protected activity, we do not disturb the Board's decision affirming the AJ's findings as to "Case B."

CONCLUSION

The record contains substantial evidence to support the AJ's findings and the Board's adoption of those findings.

**AFFIRMED**

COSTS

No costs.